1 LUCIA E. COYOCA (SBN 128314)
   lec@msk.com
2 SAMANTHA C. GRANT (SBN 198130)
   scg@msk.com
3 MITCHELL SILBERBERG & KNUPP LLP
  11377 West Olympic Boulevard
4 Los Angeles, CA  90064-1683
  Telephone: (310) 312-2000
5 Facsimile: (310) 312-3100

6 Attorneys for Defendant
  DISPLAY WORKS, LLC
7

8            UNITED STATES DISTRICT COURT

9            CENTRAL DISTRICT OF CALIFORNIA

10

11 MICHAEL BARTLEY, an individual;      CASE NO. 8:16-cv-00269-CJC-JCG
   and DERSE, INC., a Wisconsin
12 corporation,                          Before the Honorable Cormac J. Carney

13          Plaintiffs,                  **REQUEST FOR JUDICIAL
                                         NOTICE IN SUPPORT OF
14      v.                               DEFENDANT DISPLAY WORKS,
                                         LLC'S NOTICE OF MOTION AND
15 DISPLAYWORKS, LLC, a Maryland         MOTION TO DISMISS, OR IN THE
   Limited Liability Company, and DOES  ALTERNATIVE TO STAY,
16 1 through 25, ,                       PLAINTIFFS' FIRST AMENDED
                                         COMPLAINT**
17          Defendant.
                                         Time:      1:30 p.m.
18                                       Date:      April 25, 2016
                                         Courtroom: 9B
19
                                         File Date:    Jan. 7, 2016
20                                       Removal Date: Feb. 16, 2016

21

22

23

24

25

26

27

28

Pursuant to Federal Rule of Evidence 201, defendant Display Works, LLC ("Display Works") hereby requests the Court take judicial notice of the following:

1.      A February 10, 2016 Order to Show Cause With Temporary Restraints issued by Judge Arleo in the New Jersey Action (ECF 5 in the New Jersey Action), a true and correct copy of which is attached hereto as **Exhibit A**.

2.      A February 18, 2016 Order issued by Judge Arleo in the New Jersey Action (ECF 19 in the New Jersey Action), a true and correct copy of which is attached hereto as **Exhibit B**.

3.      February 10, 2016 Minutes of Proceedings issued by Judge Arleo in the New Jersey Action (ECF 49 in the New Jersey Action), a true and correct copy of which is attached hereto as **Exhibit C.**

4.      February 26, 2016 Minutes of Proceedings issued by Judge Arleo in the New Jersey Action (ECF 50 in the New Jersey Action), a true and correct copy of which is attached hereto as **Exhibit D**.

5.      A certified transcript of the February 26, 2016 Hearing on Order to Show Cause before Judge Arleo in the District of New Jersey in the New Jersey Action, a true and correct copy of which is attached hereto as **Exhibit E**.

6.      A Notice of Electronic Filing setting forth Judge Arleo's Text Order setting a preliminary injunction hearing for March 17, 2016 in the New Jersey Action (ECF 53 in the New Jersey Action), a true and correct copy of which is attached hereto as **Exhibit F**.

7.      A March 14, 2016 Order Re Jurisdictional Discovery issued by Judge Arleo in the New Jersey Action (ECF 59 in the New Jersey Action), a true and correct copy of which is attached hereto as **Exhibit G**.

8.      The March 14, 2016 Declaration of Joseph Della Sala filed in the New Jersey Action (ECF 60-3 in the New Jersey Action), a true and correct copy of which is attached hereto as **Exhibit H**.

9.      The March 14, 2016 Declaration of Al Fathali filed in the New Jersey Action (ECF 60-5 in the New Jersey Action), a true and correct copy of which is attached hereto as **Exhibit I**.

10.     The March 14, 2016 Declaration of Thomas Saltalamacchia filed in the in the New Jersey Action (ECF 60-6 in the New Jersey Action), a true and correct copy of which is attached hereto as **Exhibit J**.

11.     A March 21, 2016 Order issued by Judge Arleo in the New Jersey Action (ECF 75 in the New Jersey Action), a true and correct copy of which is attached hereto as **Exhibit K**.

The listed exhibits are subject to judicial notice because they are "not subject to reasonable dispute" in that they "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2). Federal Rule of Evidence 201(c) further provides that "[t]he court . . . must take judicial notice if a party requests it and the court is supplied with the necessary information." Fed. R. Evid. 201(c).

Here, the records of the District Court in New Jersey satisfy the requirements of Federal Rule of Evidence 201(b) because they are official public records not reasonably in dispute. See, e.g. Gay-Straight Alliance Network v. Visalia Unified School Dist., 262 F. Supp. 2d 1088, 1100 (E.D. Cal. 2001) (granting request for judicial notice of official records maintained by the California Secretary of State). Display Works has provided the Court with the necessary information required pursuant to Federal Rule of Evidence 201(c) in that it has attached the relevant records of the District Court in New Jersey and the relevant excerpts of the Certified Transcript of the February 26, 2016 Hearing on Order to Show Cause before Judge Arleo in the District Court in New Jersey to this Request as Exhibits A through K. Thus, the Court may properly grant Display Works' Request for Judicial Notice.

1

2   DATED: March 21, 2016          MITCHELL SILBERBERG & KNUPP LLP
                                   LUCIA E. COYOCA
3                                  SAMANTHA C. GRANT

4

5                                  By:   /s/ Samantha C. Grant
6                                        Samantha C. Grant
                                         Attorneys for Defendant
7                                        DISPLAY WORKS, LLC

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Mitchell
Silberberg &
Knupp LLP

7519399.1

RJN ISO DISPLAY WORKS' MOTION TO DISMISS, OR IN THE ALTERNATIVE STAY, PLAINTIFFS' FAC

# EXHIBIT A

David B. Gordon (DG0010)
MITCHELL SILBERBERG & KNUPP LLP
12 East 49th Street, 30th Floor
New York, New York 10017
(917) 546-7701

Attorneys for the Plaintiff DISPLAY WORKS, LLC

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

---------------------------------------------------------x

Display Works, LLC,                    CASE NO.    16 CV 00583 (MCA)

        Plaintiff,

   v.

Michael Bartley, an individual, and Derse, Inc.

        Defendants.

---------------------------------------------------------x

**ORDER TO SHOW CAUSE WITH TEMPORARY RESTRAINTS**

    **THIS MATTER** being opened to the Court by Mitchell Silberberg & Knupp LLP,

attorneys for Plaintiff Display Works LLC ("Display Works") upon notice to the defendants

Michael Bartley ("Bartley") and Derse, Inc. ("Derse") (collectively referred to as "defendants"),

and the Court having considered the Verified Complaint, the supporting Declaration of Nicholas

Lacamera, the Brief submitted herewith and the arguments of counsel, and the Court having

reviewed all of the papers, if any, submitted by the parties; and the Court having afforded the

parties the opportunity to be heard; and for good cause shown;

    **IT IS ON THIS 10th** day of _February, 2016

Exhibit A
Page 4

**ORDERED** that, pending the issuance of a decision on the application of Display Works for a preliminary injunction, defendant Bartley is hereby enjoined and restrained from directly or indirectly:

(a)     Hiring, soliciting, contacting, or engaging in business with any client or customer of Display Works who has not yet been retained by Derse;

(b)     Interfering or seeking to interfere with any relationship between Display Works and any of its clients, customers, or employees;

(c)     Soliciting or hiring any employee of Display Works to work for Bartley or Derse;

(d)     Communicating or divulging to, or using for the benefit of defendants, or any other person, firm, association, or corporation, other than Display Works, any Confidential Information of Display Works, as such term is defined in the Non-Competition, Non-Solicitation and Non-Disclosure Agreement between Display Works and Defendant Bartley dated January 16, 2008 (the "Non-Competition Agreement"), or proprietary information of Display Works (including, but not limited to trade secrets) which defendant Bartley discovered, developed, or became knowledgeable about while working for Display Works;

2

**IT IS FURTHER ORDERED** that, pending the issuance of a decision on the application of Display Works for a preliminary injunction, defendant Derse is hereby enjoined and restrained from encouraging, facilitating or participating in conduct of defendant Bartley from which he is hereby enjoined and restrained;

**IT IS FURTHER ORDERED** that defendants shall show cause before this Court at the United States Courthouse, 50 Walnut Street, Newark, New Jersey 07101, on the **24th** day of **February** 2016, at **11:00 AM**, why an Order should not be entered that preliminarily enjoins the Defendants from engaging in the above mentioned conduct;

**IT IS FURTHER ORDERED** that defendants shall file and serve any opposition papers to the within Order to Show Cause by **February 17th, 2016**; and

**IT IS FURTHER ORDERED** that plaintiff Display Works shall file and serve any reply to the papers to defendants' opposition by **February 22, 2016**;

**IT IS FURTHER ORDERED** that a copy of this Order to Show Cause be served upon defendants within **1** day of the date hereof via overnight courier service.

_____

MADELINE COX ARLEO, U.S.D.J.

3

# EXHIBIT B

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

**DISPLAY WORKS, LLC ,**

*Plaintiff,*

v.

**MICHAEL BARTLEY and DERSE INC.,**

*Defendants.*

**Civil Action No. 16-583**

**ORDER**

      **THIS MATTER** comes before the Court by way of Defendants Michael Bartley and Derse, Inc. ("Defendants") emergency motion to stay briefing on Plaintiff's application for preliminary injunction pending the Court's ruling on Defendant's motion to dismiss, Dkt. No. 14, and Defendants' motion to vacate the order granting the temporary restraining order, Dkt. No. 17;

      and it appearing that on February 10, 2016, this Court entered a Temporary Restraining Order ("TRO"), Dkt. No. 5;

      and it appearing that the Court scheduled an order to show cause hearing for February 24, 2016 at 11:00 AM why an Order should not be entered that preliminarily enjoins Defendants from the conduct set forth in the TRO;

      and it appearing that the Court set a briefing schedule for Defendants to file any opposition to the preliminary injunction by February 17, 2016 and for Plaintiff to reply by February 22, 2016;

      and it appearing that in lieu of filing an opposition, Defendants filed an emergency motion to stay the briefing as to the preliminary injunction pending a ruling on the motion to dismiss for lack of personal jurisdiction, Dkt. No. 14, and a motion to vacate the TRO, or in the alternative require Plaintiff to post a bond, Dkt. No. 17;

and it appearing that Defendants may enter a special appearance to oppose the preliminary injunction without waiving their right to contest jurisdiction, see In re School Asbestos Litig., No. 83-0268, 1993 U.S. Dist. LEXIS 10686, at *26-81 (E.D. Pa. Aug. 2, 1993) (holding defendant did not waive personal jurisdiction defense which was raised "seasonably and repetitively" but court ultimately required defendant to answer on merits before hearing jurisdictional issue); see also Drayton Enter., L.L.C. v. Dunker, 142 F. Supp. 2d 1177 (D.N.D. 2001) (holding that defendant did not waive jurisdiction defense where he filed motion to dismiss for lack of personal jurisdiction after filing opposition briefing to preliminary injunction motion but before commencement of hearing, and defendant preserved defense in his papers);

and it appearing that "[t]he court may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained," FED. R. CIV. P. 65(c);

and it appearing that Defendants have not provided any support indicating the amount of "costs and damages" they would sustain from being wrongfully restrained (as opposed to the amount of damages sought by Plaintiff);

and it appearing that there is no evidence Defendant will incur damages from the minimal restraints the Court imposed;

and it appearing that the amount of the bond is left to the discretion of the Court, see Zambelli Fireworks Mfg. Co. v. Wood, 592 F.3d 412, 426 (3d Cir. 2010);

Therefore, having considered the papers and for good cause shown,

IT IS on this **18th** day of February, 2016,

**ORDERED THAT:**

1.  Plaintiff shall file a bond in the nominal amount of $100 by or before the February 24, 2016 hearing;[1]

2.  Defendants' motion to stay the briefing schedule is **DENIED** and Defendants shall **<u>forthwith</u>** file its opposition to the preliminary injunction and in doing so does not waive its arguments as to personal jurisdiction;

3.  Plaintiff shall file any opposition to the motion to dismiss by **February 22, 2016**, and Defendants shall file a reply by **February 23, 2016**;

4.  The Court will hear argument on both the motion to dismiss and the preliminary injunction on **<u>February 24, 2015 at 11:00 AM.</u>**

*/s Madeline Cox Arleo*      
HON. MADELINE COX ARLEO
**UNITED STATES DISTRICT JUDGE**

---

[1] Defendants may seek an adjustment of the bond amount upon an adequate showing of the "costs and damages sustained by any party found to have been wrongfully enjoined or restrained."

# EXHIBIT C

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY
## MINUTES OF PROCEEDINGS

NEWARK                                          **Date:** 2/10/16

**JUDGE: Madeline Cox Arleo**

COURT REPORTER: Charles McGuire

DEPUTY CLERK: Amy Andersonn

**Title of Case:**                              **Docket No.** 16-cv-583(MCA)

DISPLAY WORKS LLC v. MICHAEL BARTLEY, et al.

**Appearances:**

David B. Gordon, Esq., for plaintiff
Scott M. Cooper, Esq., for defendant

**Nature of proceedings**:

Oral argument held re: application for a preliminary injunction.
Pending issuance of a decision on the application for a preliminary injunction defendant is
enjoined and restrained.
Hearing scheduled for 2/24/16 at 11:00 a.m.
Opposition due by 2/17/16, reply 2/22/16.
Request for Bond by defendant is denied.
Order to be issued.

Time Commenced <u>2:30 p.m.</u>
Time Adjourned <u>3:00 p.m.</u>

_Amy Andersonn_
Amy Andersonn, Deputy Clerk

Exhibit C
Page 10

# EXHIBIT D

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY
## MINUTES OF PROCEEDINGS

NEWARK                                    **Date:** 2/26/16

**JUDGE: Madeline Cox Arleo**

COURT REPORTER: Charles McGuire

DEPUTY CLERK: Amy Andersonn

**Title of Case:**                        **Docket No.** 16-cv-583(MCA)

DISPLAY WORKS LLC v. MICHAEL BARTLEY, et al.

**Appearances:**

David B. Gordon, Esq., for plaintiff
Lucia Coyola, Esq., for plaintiff
Eric Rumbaugh, Esq., for defendants
Scott Commeroon, Esq., for defendants
Scott M. Cooper, Esq., for defendants

**Nature of proceedings**:

Oral argument held re: application for a preliminary injunction.
The restraints are extended thru 3/9/16.
Parties shall meet and confer re: discovery, they shall submit a letter to Mag. Judge Hammer if they cannot agree on a discovery schedule.
Hearing scheduled for 3/8/16 at 2:00 p.m.
Any supplemental affidavits and briefs shall be filed by 3/7/16 at 10:00 a.m.
Order to be issued.

Time Commenced <u>2:50 p.m.</u>
Time Adjourned <u>5:00 p.m.</u>

*Amy Andersonn*
Amy Andersonn, Deputy Clerk

# EXHIBIT E

1                IN THE UNITED STATES DISTRICT COURT

2                   FOR THE DISTRICT OF NEW JERSEY

3


4    DISPLAY WORKS, LLC,              :        Civil No.
                                               16-cv-583-MCA
5                    Plaintiff,       :
                                               TRANSCRIPT OF
6             v.                      :        HEARING ON ORDER
                                               TO SHOW CAUSE, ETC.
7    MICHAEL BARTLEY, an individual, :
     and DERSE, INC.,
8                                     :
                     Defendants.
9    -------------------------------x

10
                                          Newark, New Jersey
11                                        February 26, 2016

12


13


14
     BEFORE:
15
            THE HON. MADELINE COX ARLEO, U.S.D.J.
16


17


18                                        Reported by:
                                          CHARLES P. McGUIRE, C.C.R.
19                                        Official Court Reporter

20


21
            Pursuant to Section 753, Title 28, United States
22      Code, the following transcript is certified to be
        an accurate record as taken stenographically in
23      the above entitled proceedings.

24
                                    s/CHARLES P. McGUIRE, C.C.R.
25

                          Exhibit E
                          Page 12
                       CHARLES P. McGUIRE, C.C.R.

2

1      **APPEARANCES:**

2          **MITCHELL SILBERBERG & KNUPP LLP**
           **12 East 49th Street**
3          **New York, New York 10017**
           **BY: DAVID B. GORDON, ESQ., and**
4              **LUCIA E. COYOCA, ESQ.**
           **Attorneys for Plaintiff**
5
           **DAVIS WRIGHT TREMAINE LLP**
6          **1251 Avenue of the Americas**
           **New York, New York 10020**
7          **BY: SCOTT R. COMMERSON, ESQ., and**
               **SCOTT COOPER, ESQ.**
8          **Attorney for Defendants**

9          **MICHAEL BEST & FRIEDRICH LLP**
           **100 East Wisconsin Avenue**
10         **Milwaukee, WI 53202**
           **BY: ERIC H. RUMBAUGH, ESQ.**
11         **Attorney for Defendant Derse, Inc.**

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                              CHARLES P. McGUIRE, C.C.R.

1                    THE COURT CLERK:  All rise.

2                    THE COURT:  Good afternoon.

3                    Okay.  We're here in Display Works v. Bartley.

4                    Could I have appearances, please?

5                    MR. GORDON:  Sure.  David Gordon, Mitchell

6      Silberberg & Knupp, for the Plaintiff, Display Works.

7                    THE COURT:  Okay.

8                    MS. COYOCA:  Good afternoon, Your Honor.

9                    Lucia Coyoca, Mitchell Silberberg & Knupp as well,

10     also on behalf of Plaintiff, Display Works.

11                   THE COURT:  Okay.

12                   MR. RUMSBAUGH:  Michael Best & Friedrich LLP, by

13     Eric Rumbaugh, for Derse, Inc.

14                   THE COURT:  Okay.

15                   MR. COMMERSON:  Scott Commerson, Davis Wright

16     Tremaine, on behalf of Derse, Inc., and Michael Bartley,

17     Defendants.

18                   THE COURT:  Okay.

19                   MR. COOPER:  Scott Cooper, also on behalf of Davis

20     Wright Tremaine, on behalf of both Defendants.

21                   THE COURT:  Okay, guys.  Have a seat.

22                   So we're here today following a return date of a

23     TRO that I entered on February 10th, I believe.

24                   So I just want to sort some preliminary issues.

25                   One has to do with the ex parte application to

1    enjoin me that was denied by opinion of Judge Carney.

2            Who was involved on the defense end for filing

3    that application?

4            MR. RUMBAUGH:  I was, Your Honor.

5            THE COURT:  Okay.  You can stand.

6            You're in New Jersey now.  Let me give you a

7    couple of -- let me ask you a question.  Why did you file

8    this ex parte knowing that there was counsel in this case

9    and that your firm was before -- your colleagues were before

10   me in New Jersey and you knew that Display Works was

11   represented by counsel?

12           MR. RUMBAUGH:  I want to make sure I understand

13   your question, Your Honor.

14           THE COURT:  You filed an ex parte application to a

15   California judge to enjoin me.  Correct?

16           MR. RUMBAUGH:  Actually, Your Honor, what we asked

17   the judge to do was to enjoin Display Works from enforcing

18   the noncompete agreement or any order of that --

19           THE COURT:  So then Judge Carney's order is wrong?

20           MR. RUMBAUGH:  Well, he says essentially enjoining

21   -- he's saying that the effect of it would be to enjoin this

22   Court.

23           THE COURT:  It says -- I'll read it for you:

24           "Plaintiffs seek remarkable relief, essentially an

25   injunction forbidding the enforcement of an injunction

1    issued by -- " -- in italics -- " -- another Federal Court.

2    Such relief would be appropriate only in the most unusual of

3    circumstances."

4            And the beginning says:  "Before Mr. Bartley

5    served Display Works with a complaint, Display Works filed

6    an action in New Jersey Federal Court seeking to have the

7    nonsolicitation provision enforced.  It subsequently moved

8    for a TRO enjoining Bartley from violating the provision

9    before the New Jersey court calling for a full hearing and

10   briefing on a motion for a preliminary injunction.  The

11   New Jersey court granted the motion for TRO on February 10th

12   and scheduled a preliminary injunction hearing for the 26th.

13   On February 19th, Plaintiff filed an ex parte application to

14   this Court for a TRO enjoining Display Works from enforcing

15   the nonsolicitation clause and from attempting to enforce

16   the New Jersey TRO."

17           MR. RUMBAUGH:  Your Honor, I apologize.  I think

18   -- we called it ex parte, but we gave them notice before we

19   filed it.

20           THE COURT:  Did you have notice of that?

21           MS. COYOCA:  Your Honor, we --

22           THE COURT:  You can stand when you address the

23   Court.

24           MS. COYOCA:  Of course, Your Honor.

25           Yes, we did receive notice the day before they

1    filed it.

2              THE COURT:  Okay.  Let me just tell you my views

3    on ex parte, how it would work in New Jersey, okay?

4              The rules of professionalism govern here, as well

5    as the Rules of Civil Procedure, the New Jersey Rules of

6    Professional Conduct.

7              It's a privilege to practice pro hac vice in

8    New Jersey.  We take professionalism very seriously here.

9              I don't want to see ex parte applications ever in

10   my courtroom once an action is filed, ever.  I don't want to

11   see the day before giving last-minute notice on an

12   application like this.

13             And certainly if you file any other actions

14   looking to enjoin me, I want notice of them.  I want the

15   courtesy of a notice.  That's courtesy.  You're filing an

16   application, which is an extraordinary relief, to enjoin me,

17   without seeking some kind of emergency relief before me,

18   which you didn't do.

19             I can tell you that it is extraordinary for me to

20   ever grant ex parte relief.  I've never done it.  And when

21   counsel came here on the 10th, I made sure that they had

22   notice to Mr. Bartley and to Derse, and counsel came, and

23   they had an opportunity to be heard, and the restraints I

24   imposed were minimal and much less broad than had been

25   requested by the Plaintiffs, and I set this case down for

1    return date.

2              If there was some kind of emergency reason why you

3    couldn't wait until today to be heard, the appropriate

4    course is to come back to me.

5              MR. RUMBAUGH:  Okay.

6              THE COURT:  That's how I want things done.  And I

7    want you to know that's how I expect all lawyers to behave:

8    With grace, with professionalism, and with common courtesy.

9    And the common courtesy is to come back to me.

10             MR. RUMBAUGH:  Your Honor, I completely appreciate

11   that, and I respect that.

12             If I can just clarify one thing.

13             We called it ex parte in California, but not only

14   did they get notice, but they had an opportunity to brief in

15   opposition.  So we had filed our papers on Friday.  They

16   briefed a full 25-page opposition on Wednesday, and

17   Judge Carney issued the order on Thursday.  So although it's

18   called an ex parte, there was a full opportunity to brief

19   it.

20             THE COURT:  Okay.  Well, in the future, if what

21   you're really looking to do is -- I'm not going to tell you

22   how to practice, but I will tell you this much:  If what

23   you're really doing is trying to do an end run around my

24   TRO, give me notice of it.  Okay?

25             I don't want this to ever happen again before me.

1       You can appeal to the 3rd Circuit.  You can appeal to the

2       Ninth Circuit.  You can appeal to the Supreme Court.  I want

3       notice of it if it involves my order.

4              Okay?  Understood?

5              MR. RUMBAUGH:  Yes, Judge.

6              THE COURT:  Okay.

7              Second point.  So I entered very minimal

8       restraints, and I entered the restraints back on the 10th,

9       primarily based on an affidavit -- there was a verified

10      complaint, there were affidavits, but it was really based in

11      large part on this nonsolicitation agreement that

12      Mr. Bartley does not dispute that he signed back in --

13      it's dated, the one that is operative, January of '08, and

14      it precluded him from, among other things, hiring, accepting

15      work, soliciting customers, as well as interfering or

16      seeking to interfere with relationships with other

17      employees.

18              So if I had to sum up the concern and why I

19      entered the TRO, it was based on soliciting customers,

20      soliciting employees, and utilizing trade secret

21      information.

22              So the restraints that I entered only -- despite

23      what I thought were things you don't see on that kind of an

24      emergency application, an allegation that they had

25      solicited, I think they said, paragraph 53 of the verified

1    complaint, two dozen clients, they solicited 13 employees,

2    and five had actually resigned, and then there were also

3    allegations that they had defamed Display Works to many of

4    these clients of Display Works.

5           And the TRO, really, despite the allegations of

6    all the solicitations, I just said going forward -- you

7    know, what happened, happened, but going forward, they would

8    be prohibited from hiring, soliciting, contacting, or

9    engaging in business with a customer that had not yet been

10   retained by Derse.  So I limited it.  So going forward, you

11   couldn't solicit new customers, and you couldn't solicit new

12   employees, and you couldn't use trade secret information.

13          That was really the sum and substance of the

14   restraints that I entered.

15          And what I found really concerning was the

16   strength of the allegations about soliciting customers,

17   about soliciting employees, and the alleged defamatory

18   comments, and, in fact, they talked about this one e-mail

19   that was sent, it looked like mistakenly, back to Display

20   Works, to an employee who had left the company, one of the

21   employees that they mentioned had been solicited, and it

22   looked like it was mistakenly sent to Display Works instead

23   of going to the new e-mail address at Derse, and that's

24   detailed in both the verified complaint as well as the

25   brief, and the subject of the e-mail was Re Uretek Trail

1    Blog From Mike, apparently Bartley, to someone else at

2    Derse, speaking about clients and employees.

3              I'll just quote one line from it that talked about

4    an attempt:  "DW is having Lucy contact all Alison clients

5    but we already got to most of them Friday with all positive

6    responses."

7              And it goes on.

8              So my first question is -- and I know it's a

9    little out of order, and I'll tell you the order in which

10   I'm going to address things -- is there any dispute that

11   Derse has been -- Bartley, I should say, has been

12   contacting, soliciting former clients and employees of

13   Display Works?

14             Because there's nothing in the papers that says,

15   This is not true; they came to us, we had nothing to do with

16   soliciting to them.

17             MR. COMMERSON:  Well, with respect to --

18             THE COURT:  Stand up when you talk to the Court.

19             MR. COMMERSON:  Sure.

20             With respect to employees, it is disputed.  The

21   Lucy e-mail that the Court refers to is Mike Bartley

22   commenting on someone that had already been recruited by

23   Derse.  Mr. Bartley submitted affidavits saying he hasn't

24   recruited any Display Works employees.  Each of the

25   employees that's come over submitted affidavits with the

1    Court saying they were not recruited by Mr. Bartley.  One of

2    them came from a headhunter which Derse paid a fee to, which

3    is in the record before the Court.  One had already accepted

4    a job with another Display Works competitor, a company

5    called M Squared.  Then Derse recruited him away from them.

6           These people were all contacted largely through

7    their LinkedIn accounts.  They were not contacted, even in

8    part, by Mr. Bartley.

9           Mr. Bartley did send an e-mail that commented on

10   the recruiting of one person, but she had already been

11   contacted and I believe she had been interviewed.

12          And we cite a California case in our brief for the

13   proposition that that's not recruiting, that's not

14   soliciting.  He didn't have any contact with her.  He

15   commented on a contact.

16          More fundamentally, though, Your Honor, and with

17   respect to Mr. Bartley contacting customers, I can't answer

18   on that.  Derse has contacted customers, and Display Works

19   says that two of them have come over.  I haven't seen that

20   documentation, but I don't --

21          THE COURT:  I think they said that dozens of them

22   were contacted, and I'm not sure how many you said actually

23   went over to Derse.

24          How many did you --

25          MR. GORDON:  As of the date that you entered the

1    TRO, there were two.

2              If I could just comment on one thing that's been

3    said.

4              THE COURT:  Sure.

5              MR. GORDON:  I think it's important, because I

6    think if you link up one of the declarations that they

7    served last night, which was effectively a surreply, by the

8    way, Your Honor, it's the declaration of Lucy --

9              THE COURT:  Did we get that one?

10             MR. GORDON:  -- Montoya Roberts.

11             THE COURT:  Did you file a surreply without

12   permission of the Court?

13             MR. GORDON:  They filed --

14             THE COURT:  I went over the papers --

15             MR. COMMERSON:  We filed a reply last night, per

16   the Court's order, our reply was due yesterday, and we --

17             THE COURT:  That, we have.

18             But you're talking about a surreply affidavit?

19             MR. GORDON:  They served five -- I can't remember

20   the number, there were at least five declarations that

21   specifically go to the injunction issue, which, as far as I

22   can tell, is over a week late, Your Honor.  These were

23   surreplies to our reply.

24             THE COURT:  I'll take a look.  Go ahead.

25             MR. GORDON:  I think I can maybe match something

1    up here.

2              That e-mail that you've been focusing on, it was

3    exhibit -- it's the January 16th, 2016 e-mail.  There's a

4    line in it that says, "Spoke to Adam to have Sheri reach out

5    to Lucy -- " --

6              THE COURT:  -- " -- to make sure she knows we are

7    interested as we heard she is feeling otherwise.  Need to

8    keep her engaged."

9              That's from Bartley.

10             MR. GORDON:  Right.

11             Now, the thing is, they submitted these

12   declarations saying, oh, well, Mr. Bartley wasn't involved,

13   Sheri was involved.

14             Well, here, what you have is the e-mail that says

15   that Mike Bartley --

16             THE COURT:  Mike is telling Sheri to do it for

17   him.

18             MR. GORDON:  Mike is telling Sheri to do it.

19             The prohibition is not just on a direct

20   solicitation; it's also on an indirect.

21             THE COURT:  Indirect.

22             MR. GORDON:  So what you have here is on the face

23   of this e-mail an indirect solicitation and confirmation in

24   Lucy Montoya Roberts' belated declaration saying, I was

25   solicited by Sheri.  It links up perfectly.

14

1          MR. COMMERSON:  Back to the Court's question.

2          THE COURT:  Yes.

3          MR. COMMERSON:  A, that's not a solicitation.

4  Lucy had already been contacted, not at the direction of

5  Mr. Bartley, so this is after the initial contact.

6          Second, -- and this really goes to the heart of

7  the matter -- the agreement is not only invalid; it's

8  illegal.

9          THE COURT:  Well, let's talk about that for a

10  minute.

11          Let me tell you what concerns me and what I'm

12  thinking about doing, and it is this.  Number one -- I'm

13  just giving you an outline of where we're going, and we can

14  talk about it in steps.

15          The first issue is whether there is personal

16  jurisdiction over both Bartley and over Derse, and I'll go

17  into this in detail in a minute, but I'll give you just the

18  outline of where I'm headed.

19          The first issue is specific jurisdiction.

20          I'm not satisfied there's general jurisdiction of

21  anyone in this case.  But I am satisfied preliminarily that

22  there appears to be specific jurisdiction over Bartley based

23  on the volume of his contacts with New Jersey and his role

24  as a high -ranking executive for Display Works.  And I can

25  go through that later.  I think it's set forth in the

1    verified complaint as well as in the first and the second

2    affidavits of Mr. Lacamera, and I'm inclined to find that

3    there is specific jurisdiction over him.

4         I'm not equally satisfied there's specific

5    jurisdiction over Derse, yet, although certainly with

6    respect to the tort issues, there may be, looking at the

7    Calder test or the general test for jurisdiction, that I'm

8    not sure that the Defendants expressly aimed their tortious

9    conduct to the forum.  There's evidence of clients and

10   employees that were solicited.  I'm not sure any of those

11   clients or employees were New Jersey employees or clients.

12   I'm not sure, and we don't have evidence of it at this

13   stage, whether the defamatory comments were made in

14   New Jersey.  If they were, if a client was solicited in

15   New Jersey, a New Jersey client or a New Jersey employee,

16   I'd be inclined to find that there was specific jurisdiction

17   over Derse.  I don't have that yet, because I think that

18   needs to be the subject of further discovery or a hearing.

19        And as to the consent to jurisdiction, that's

20   something I'd like to take under advisement for a little bit

21   more.  There's certainly law both ways whether the

22   registering to do business in New Jersey and having service

23   of process accepted in New Jersey is enough.  It's something

24   I want to look at a little bit more closely, which is really

25   just a legal issue, but certainly the whole issue about

1    whether there was expressly aimed tortious conduct in

2    New Jersey is something that I think is missing from the

3    affidavits.

4         So I'm inclined to allow some very quick

5    discovery, and maybe we'll come back here in a week, either

6    with live witnesses or with affidavits.

7         Now, that's the personal jurisdiction issue.  It's

8    the big one.

9         The second issue is as to the merits of the TRO.

10        There's an argument made by the Defendants that

11   the Plaintiff has not shown reasonable likelihood of success

12   on the merits, and their entire argument rests on the legal

13   argument that California law applies to all the claims.

14        And I know you sent -- you know, there's a lot of

15   back-and-forth between the lawyers on this point.

16        I'll tell you what strikes me as the proper

17   application of the law.

18        No one disputes that there is this contract, this

19   nonsolicitation agreement and nondisclosure agreement that

20   recites that Maryland law applies, and to whether or not

21   Maryland law should apply in applying choice of law

22   principles here in New Jersey, I would only overturn that

23   choice of law provision if it conflicted with the public

24   policy of the State of New Jersey.  And I'll explain this on

25   the record in a little bit greater detail.

1          I'm not convinced that the restatement, the

2     materially greater interest test of the restatement applies

3     by looking closely at the New Jersey cases, but rather

4     New Jersey law would only overturn a choice of law provision

5     if it conflicted with the public policy of the State of

6     New Jersey.

7          Here, there's no conflict between New Jersey and

8     Maryland law on that point.

9          So that would leave me applying Maryland law, and

10    Maryland law would uphold this agreement.

11         The Defendants' argument rests on this application

12    of the restatement test, and I'm not sure the restatement

13    test has been applied or does apply here, and I can talk

14    about that in a minute.

15         I do agree with Defendants that the choice of law

16    analysis on the tort claims would be different, although I'm

17    not sure it has a different outcome, and in any event, the

18    restraints that I impose rest entirely, almost exclusively

19    on the nonsolicitation agreement.

20         So if I'm satisfied that New Jersey law applies --

21    I mean, Maryland law applies, then I begin where I started,

22    which was on February 10th, to say that I'm satisfied that

23    they have demonstrated a likelihood of success on the merits

24    on the breach of the nonsolicitation clause.  And we'll talk

25    about that in a minute, and I'd like to hear your response

1   to it.  That's where I'm headed, is to let you satisfy the

2   Court on the personal jurisdiction, extend the restraints,

3   which I'm entitled to do under Rule 65 for another 14 days

4   or until March 9th, have a hearing before the date that the

5   restraints can expire, and see whether I have jurisdiction

6   over Derse or not.  I certainly have jurisdiction over --

7   and I'll give a fuller reading on the record on that in a

8   minute.

9            But I'd like to hear both sides respond to that.

10           MR. GORDON:  I would just like to confirm I think

11   your reading of the case law on the choice of law is exactly

12   right.  I think it's really a three-part test that you have

13   to satisfy.

14           THE COURT:  It is.  I just wanted to give an

15   outline.

16           MR. GORDON:  Yes.

17           THE COURT:  I understand that.  The third prong is

18   where I'm most concerned.  On the choice of law.

19           MR. GORDON:  Yes, on the choice of law.  We really

20   studied this quite hard ourselves, and I think the thing

21   that's absolutely clear from all the cases is that before

22   you ever get into the restatement, there has to be a

23   conflict between the chosen law and the law of the forum .

24   If there is a conflict, then you get into the restatement.

25   And we've actually seen that analysis in other jurisdictions

1       that also look to the restatement.  I can give you examples.

2            But we've also cited to you, as I think you know,

3       a number of cases that just stop the analysis with the fact

4       that there was no conflict between the chosen law and the

5       law of the forum, and the reason that the analysis stops

6       there is because if you don't meet that test, you don't even

7       go any further.  And we've cited to you a 3rd Circuit

8       decision and several District Court decisions on that point

9       as well.

10           THE COURT:  Let me ask you a question.  Do you

11      have any evidence in terms of the personal jurisdiction

12      issue with respect to Derse that any of the harm was

13      inflicted upon either -- or any of the actions, a New Jersey

14      employee or a New Jersey customer or any defamatory

15      statements were made in New Jersey?

16           MR. GORDON:  I'll let my colleague address that

17      one.

18           MS. COYOCA:  Yes, Your Honor.  I wanted to respond

19      directly to that question, and I also want to address the

20      issue of the law with respect to this particular point.

21           As to the conduct that occurred with respect to

22      New Jersey in terms of New Jersey-related conduct, you have

23      gone through the January 15, '16 e-mail from Bartley to the

24      CEO of Derse and the head of HR who is cc'd on that and the

25      references to Lucy Montoya, et cetera.

1            Well, in addition to that, as part of that same

2     e-mail, there is a discussion about DW has gone out to all

3     of Alison's clients.

4            THE COURT:  That's right, and you listed all the

5     clients, and Mama's and Papa's had a trade show in

6     New Jersey.

7            MS. COYOCA:  Right.

8            THE COURT:  But there's no evidence that Mama's

9     and Papa's was a New Jersey company.

10           MS. COYOCA:  I don't believe that it is,

11    Your Honor, it's not necessarily a New Jersey company.

12    But the point of the matter is that it's actually doing

13    business in New Jersey by participating in that trade show.

14           THE COURT:  That's a little different.  I'm not

15    sure that that's enough, honestly, and there's been some

16    changes in the law, and I'll certainly put it in a more

17    formal written opinion, but I think you need to show that

18    either under the Calder test or just the specific

19    jurisdiction test that they expressly aimed tortious comment

20    at the forum.

21           MS. COYOCA:  Your Honor, if I could briefly

22    address that.

23           THE COURT:  Sure.

24           MS. COYOCA:  That may be true with respect to the

25    Calder effects test, but if you're talking about the

1    specific jurisdiction minimum contacts analysis, when you

2    harken back to the Burger King Supreme Court decision,

3    you're really supposed to be looking to whether or not the

4    Defendant purposely directed his activities at the residents

5    of the forum.  And in the Miller Yacht case that was decided

6    by the 3rd Circuit back in 2004, they specifically go

7    through the analysis that says, Look, we don't think that

8    Burger King was requiring the party to go through this kind

9    of proximate cause analysis in order to establish

10   jurisdiction.  Instead, that is for the Calder effects test

11   when you're looking to the tort issue.  But when you're

12   looking at the minimum contacts specific jurisdiction

13   analysis, that is not what Burger King is requiring us to

14   do.  It's requiring us to merely look at, was there conduct

15   that was directed at a resident of the forum.  And that's

16   exactly, precisely what occurred here.

17          I take it that you are also looking in addition to

18   that to be buttressed by actual acts taking place with

19   respect to residents of New Jersey, and we would appreciate

20   the opportunity for discovery on that.

21          But, having said that, we don't believe that under

22   the Miller Yacht decision that it is necessary for the

23   conduct to be expressly directed to the forum and that

24   instead, the requirement is that it be directed to a

25   resident of the forum.

1          THE COURT:  Okay.  Thank you.

2          Would you like to respond?

3          MR. COMMERSON:  Sure.

4          I'll start with my second point.  I'm reading from

5     the restatement, and the restatement does not -- there's

6     just a fundamental schism here that underlies everything.

7     And let me back up.  There's -- and I'll go a little more

8     fundamental in my point.

9          There's been an allegation that Mr. Bartley

10    forum-shopped, being California.

11         So Mr. Bartley resigns.  At the time -- during his

12    employment, the HR director at Display Works opined several

13    times to --

14         THE COURT:  I know.  I read that in your papers.

15         Look, whether something is illegal or enforceable

16    or not enforceable will be determined by a court after

17    briefing by lawyers.  I'm not going to take like an advisory

18    opinion from an HR director.  It is what it is.  He signed

19    it.  There's no allegation he signed it under duress, that

20    it's unenforceable because he didn't know what he was doing.

21    He signed it.  So I'm not moved at all by the fact that some

22    HR director back in '08, before he signed it, said, I think

23    these are illegal in California.  It doesn't move me.

24         MR. COMMERSON:  Okay.  That said, so Mr. Bartley

25    resigns, and in California, the agreements -- you can't have

1    a customer nonsolicitation or a noncompete.  They're both

2    illegal, and having one is a violation of California

3    Business and Professions Code Chapter 17200.  It's a per se

4    violation.  By enforcing it, by enforcing, they're violating

5    the California Business and Professions Code Chapter 16600

6    and Chapter 17200.

7              THE COURT:  They're only violating it -- you know,

8    he signed it.  He agreed to sign it, and he was working for

9    a New Jersey company that had a connection to Maryland.  So

10   when you say it's -- you throw "illegal" around.  He is a

11   sophisticated businessman who signed an agreement that said,

12   I will be bound by this nonsolicitation, I agree that I am

13   not going to solicit clients.

14             He could have said, I'm not signing this, this is

15   illegal.  He signed it.  He was a high-ranking -- in fact,

16   he asked -- according to them, he asked for other people

17   under him to sign a similar agreement.  So that's what they

18   allege, like he turned around and said, I want one of these

19   younger, you know, people under me to sign it, for the same

20   reason, to protect the company.  And frankly, they are --

21   other than California, they are routinely upheld.  They're

22   routinely upheld here.  It's not illegal, like it's guns or

23   it's, you know, it's a grenade; I mean, it's something that

24   has different meaning and different interpretations in

25   different states.  But he signed it with respect to his

1    employment for a New Jersey company soliciting business all

2    over the country, bound by Maryland law.

3            So we're here in Federal Court, and Federal Court

4    sitting in New Jersey looks to New Jersey choice of law, and

5    there's a choice of law provision that says Maryland law

6    governs, and the New Jersey courts say unless there's a

7    conflict between the public policy of New Jersey and the

8    choice of law that the choice of law prevails.

9            So what you're asking me to do is apply a

10   restatement test that the courts of New Jersey don't apply.

11   They apply the public policy standard.

12           So I would be ignoring my obligation to apply

13   New Jersey choice of law provisions because this is where we

14   are.  I would be saying, I don't care what the New Jersey

15   law says, I'm going to apply a restatement test because

16   that's what the Defendants tell me will apply.

17           Let's look carefully at the cases.

18           Warner v. Danton, which is from the 3rd Circuit,

19   which I am bound to apply, says the Federal Courts apply the

20   law of the forum state here in New Jersey while conducting a

21   choice of law analysis.  That's Warner v. Danton,

22   475 F.3d 495-497 (3rd Cir. 2007).

23           Defendants cite Meadox v. Life Systems, District

24   of New Jersey case 1988 found at 3 F. Supp. 2d 549, which in

25   turn cites Kalman Floor v. Muscarelle, 196 New Jersey Super.

1     16-21 (App. Div. 1984), affirmed by the New Jersey Supreme

2     Court, 98 New Jersey 296, for the proposition that

3     New Jersey applies restatements that can have conflicts of

4     law, section 187.  Kalman does not apply the restatement.

5     It cites the restatement, but the proposition it actually

6     applies is directly contrary to the restatement, namely,

7     that the courts will uphold a contracts choice of law

8     provision if it is not violative of New Jersey's public

9     policy.  The restatement provides for upholding a contract's

10    choice of law provision if it is not violative of the public

11    policy of whatever state has a material greater interest

12    than the chosen state.  The appropriate analysis is

13    therefore whether giving effect to the forum state selection

14    clause would conflict with New Jersey's public policy.

15            And, in fact, the 3rd Circuit in a footnote in

16    G.M.C. v. Chevrolet, 263 F.3d 296, said:  "New Jersey gives

17    effective contracting parties private choice of law clauses

18    unless they conflict with New Jersey public policy."  That's

19    a 3rd Circuit case in footnote 21 from 2001.

20            So you're asking me to adopt what a District Court

21    here said in applying the highest court of the State of

22    New Jersey.  I'm bound to apply the highest court of the

23    State of New Jersey, and, frankly, the 3rd Circuit's

24    interpretation of that, not another sister or brother

25    District Court in New Jersey.

1          MR. COMMERSON:  I would submit that Maryland has

2   adopted the restatement, and if the Court is going to apply

3   Maryland law, Maryland would apply California law --

4          THE COURT:  I hear you.  But for choice of law

5   analysis, I apply the restatement test -- I mean, I apply

6   the -- I'm sorry.  I apply the law of the forum state, not

7   the law of New Jersey -- not the law of Maryland.  The forum

8   state is New Jersey.  So the 3rd Circuit is my boss.

9   They're the ones I follow.  They say that New Jersey gives

10  effect to the contracting party's choice of law clauses

11  unless they conflict with the New Jersey public policy.  And

12  that's because we apply the law of the forum state here in

13  New Jersey, and New Jersey says, unless it conflicts with

14  New Jersey public policy, you give effect to the choice of

15  law provision.

16          That's really the real clean and honest

17  interpretation of the choice of law argument.

18          MR. COMMERSON:  So Mr. Bartley is in California.

19  He submits a resignation letter, and -- let me back up more.

20          While New Jersey can apply New Jersey law,

21  New Jersey businesses doing business in other states have to

22  follow the laws of those states.  In some states, for

23  instance, it's illegal to discriminate based on sexual

24  orientation; in some, it's not.  In some states, it's

25  illegal to discriminate based on a conviction record; in

1    some states, it's not.  The fact that a business is located

2    in New Jersey doesn't mean that it's -- in Wisconsin, for

3    instance, it's illegal to discriminate on sexual

4    orientation.  A New Jersey employer can't go out and fire

5    somebody because they're gay in Wisconsin or because they

6    have a conviction record in New York because New Jersey has

7    a different law.

8            Mr. Bartley, it's undisputed, has lived and worked

9    his entire career in California.  Ninety-five percent of his

10   work is in California.  He's been in New Jersey once.  His

11   contract and Display Works's violation of that contract is a

12   tort and a per se violation of the California Business

13   Professions Code, regardless of whether this Court asserts

14   jurisdiction or not.

15           So Mr. Bartley resigns.  He tenders a resignation

16   letter and he says, Please release me from my noncompete.

17   Display Works never responds until they file this lawsuit.

18           So Mr. Bartley files a lawsuit, which he's

19   entitled to file.  Just like if Display Works fired him

20   because he's gay in a state where that's illegal, if a gay

21   employee was fired because he's gay, he would be entitled to

22   file a state lawsuit in the state in which Display Works

23   violated the law.  Display Works has violated California law

24   per se.

25           Mr. Bartley's lawsuit in California was first

1    filed.  By removing it, the date of first filing -- the date

2    of first filing is reckoned from the date the State Court

3    case was filed.  Jurisdiction is to be determined by the

4    first filed court.

5                 THE COURT:  Well, you know, let me stop you.

6    There are a couple of things.

7                 MR. COMMERSON:  It was not a bad-faith

8    forum-shopping lawsuit by Mr. Bartley.  Where should

9    Mr. Bartley have gone?

10                It's not disputed and not disputable that Display

11   Works is violating California law.

12                THE COURT:  Let me stop you for a minute.

13                You keep saying that.  That would be true if he

14   was employed by a California company, and he lived in

15   California, and the company that employed him was in

16   California, and they tried to -- it would be a whole

17   different analysis because there would be no jurisdiction

18   in New Jersey.

19                MR. COMMERSON:  Is the Court --

20                THE COURT:  He was hired by a New Jersey

21   corporation to work throughout the country, and he agreed,

22   he signed a document that said he is bound by Maryland law,

23   and he said -- he agreed not to solicit employees.  He

24   signed it.  He could have said -- if what you're telling me

25   now is, at the time he signed this agreement, he had

1    absolutely no intention of abiding by it, that he signed

2    that knowing he had no intention, it's almost starting to

3    sound a little bit like a fraud, because maybe then in 2008,

4    maybe Display Works would have said, If you have no interest

5    in signing this agreement because you think it's illegal

6    because you think you're a California resident, you are in

7    California and California law applies and nothing else and

8    you can't sign this, then we are going to end your

9    employment now.

10           MR. COMMERSON:   That is a violation of California

11    law.

12           THE COURT:   But he didn't do that.  He said, I

13    will sign this because I work for a New Jersey company and I

14    will be bound by it, and I'll agree not to do these things.

15           Because California has an interest in making sure

16    employers in California abide by the California law.  We

17    wouldn't even be here if Display Works wasn't a New Jersey

18    company, first thing.

19           Secondly is, if he had no interest in -- if he

20    believed -- now, I don't think -- after he paid lawyers and

21    after he got fired and lawyers gave him advice and said it's

22    not enforceable, that's one thing.  But what we are

23    procedurally is, we're in New Jersey.  He has sued -- he has

24    brought this lawsuit -- Display Works has brought this

25    lawsuit for violation of this agreement that he agreed not

1    to solicit customers, and I'm applying straight up the

2    choice of law analysis that the 3rd Circuit says I should

3    apply, which would say Maryland law can apply here, number

4    one.

5              So that's where I'm coming from.

6              What you're really arguing for is, we should

7    transfer it to California, which is a different argument.

8    And I'm not prepared to do any of that until I find that

9    there is personal jurisdiction, which I think is the first

10   inquiry, over Derse, which I'm not satisfied there is.

11             MR. COMMERSON:  I understand the Court's position.

12   I'd line to finish my point.

13             THE COURT:  Sure.

14             MR. COMMERSON:  So New Jersey will assert

15   New Jersey law over an employee that is working in

16   New Jersey, even for a foreign corporation.  A Michigan

17   corporation, an Illinois corporation, a French corporation,

18   if you've got employees working in New Jersey, New Jersey

19   says you have to pay paid sick leave.  An employee can sign

20   an agreement all day, saying, I opt out of paid sick leave,

21   I renounce it.  New Jersey law is going to trump.  And if

22   the French or German or Florida or Texas company comes and

23   says, We're in Texas, we're not going to follow New Jersey

24   law, a clerk can assign something - they waive their right

25   to New Jersey sick leave.  New Jersey is going to say, thank

1    you for playing, your employees work in New Jersey, we're

2    applying New Jersey law.

3            Mr. Bartley's lawsuit in California was and is

4    correct, and he is going to win.  Display Works is blatantly

5    violating California law, just like a Texas corporation

6    coming into New Jersey violating New Jersey law and trying

7    to say to a New Jersey court, We don't have to follow

8    New Jersey law, we're based in Texas.  Our employee happens

9    to live and work in New Jersey, we don't have to follow

10   New Jersey law.  It's a nonsensical argument.

11           So Mr. Bartley files his well-grounded lawsuit,

12   his correct lawsuit he's going to win in California.  Where

13   should he file it if he's not going to be engaged in forum

14   shopping and gamesmanship?  Should Mr. Bartley -- and to

15   hear out the other side argue, he should have filed his

16   California Business and Professions Code Chapter 16600

17   lawsuit and his California Business Professions Code Chapter

18   17200 lawsuit in New Jersey?

19           New Jersey has almost no connection to this case.

20           THE COURT:  What are you talking about?  He filed

21   it and he didn't serve it.  Right?  He sat on it.  He didn't

22   serve it.

23           They came immediately and as soon as they had

24   knowledge.  Where should they file it?  They should file it

25   here, because they're a New Jersey company and he was

1    employed by them, and he had contact with them every day,

2    and so they filed the lawsuit here before there was even

3    service effectuated here.

4            MR. COMMERSON:  Not true.  Display Works served

5    Derse before Bartley served them.  But Bartley served

6    Display Works before Bartley was served.  So the service

7    went, Display Works -- or Derse, Display Works, Bartley.

8    Bartley was the last served of the three.  So Bartley served

9    Display Works with his California lawsuit before Display

10   Works served Bartley with their New Jersey lawsuit.

11           THE COURT:  That's different than what the sworn

12   affidavits that I've gotten from the parties --

13           MR. COMMERSON:  It's a matter of record, Your

14   Honor.

15           THE COURT:  Okay.  We'll figure it out.

16           MR. COMMERSON:  And in their original brief

17   anticipating the first-filed argument, Display Works argues,

18   correctly, the first-filed rule doesn't apply because

19   Mr. Bartley filed in State Court.  But they removed.

20           THE COURT:  They removed after I already imposed

21   restraints.

22           MR. COMMERSON:  When you remove, as we've briefed

23   in a separate brief, the date first filed is reckoned from

24   the filing of the removed State Court case.

25           By the way, Mr. Bartley didn't do anything wrong

1    in delaying service.  He served timely, he didn't untimely

2    serve, and he served before they served him.

3            But what was happening was, I called Display

4    Works' counsel, Attorney Lapidas, who -- I don't know if

5    he's in this case or not.  Display Works has similar

6    litigation going on in Maryland.

7            THE COURT:  Involving Bartley?

8            MR. COMMERSON:  No, it has nothing to do with

9    Derse or Bartley.  There's another company they claim

10   poaches their employees, and they've sued them.  Thirty

11   people left en masse last -- or a while ago to go to another

12   company called Pinnacle, and Display Works is suing them.

13           So I knew about that litigation, so I called

14   Attorney Lapidas and said, Hey, look, will you release -- I

15   repeatedly asked him, will you release Bartley from his

16   noncompete, you're violating the law, to which Mr. Lapidas

17   -- and this is in my affidavit -- repeatedly said, We're not

18   doing anything to enforce it, the idea of having illegal

19   noncompetes, you can't get blood for that, you won't get

20   damages until we take a step to enforce it.

21           It was illegal to have it.  By enforcing it,

22   they've aggravated it.  Whatever damages they would get here

23   are going to be countered by damages in California.  Just

24   like New Jersey would say to a Texas corporation, You can't

25   violate Texas -- or New Jersey civil rights law or wage and

```
1    hour law or healthcare law just because you're headquartered

2    in Texas, Display Works is, right now, as we stand here,

3    violating California law.

4            So Bartley files his lawsuit in California, and

5    the only place he could file it.  It's silly to say he

6    should have filed it --

7            THE COURT:  What about the defamation counts, and

8    what about the solicitation of employees of Display Works?

9            MR. COMMERSON:  First of all, the employee

10   solicitation clause is in the same sentence as the

11   noncompete.  It's in --

12           THE COURT:  I think there's two different places

13   where it exists.

14           MR. COMMERSON:  It is, and in both cases, it's

15   commingled in the same sentence as an illegal clause.

16           Second, as to defamation, we can't find any

17   defamation.  There's no allegation that Bartley -- I believe

18   it's paragraphs 49, 50 and 51 of the complaint where his

19   defamation is characterized.  There's no allegation that

20   Bartley personally defamed anybody.  If counsel has got

21   Rule 11-passable personal knowledge that Mr. Bartley

22   personally defamed Display Works --

23           THE COURT:  Well, let me stop you for a minute.

24           Paragraph three says "interfere or seek to

25   interfere with any relationship between the company and its
```

1    clients, customers, employees, or suppliers."

2              MR. COMMERSON:  Right.

3              THE COURT:  Interference with the relationship

4    with the company certainly wouldn't be protected under the

5    California law.  That's different than not soliciting or

6    accepting work.

7              MR. COMMERSON:  You can't blue-pencil in

8    California.

9              THE COURT:  But there's a different point.  You

10   said to me a second ago that it's intermingled within the

11   same sentence.  It is not.

12             MR. COMMERSON:  If the Court could read that --

13             THE COURT:  "Interfere or seek to interfere with

14   any relationship between the company and any of its clients,

15   customers, employees, or suppliers."

16             MR. RUMBAUGH:  Right.  Clients --

17             THE COURT:  One at a time.  This is how we work in

18   Federal Court.  We don't have two lawyers -- stop.  Stop.

19             I have a Court Reporter in the room.  He can take

20   down one person at a time.

21             Two lawyers never speak at the same time in the

22   same courtroom, especially when the judge is also speaking.

23   Okay?

24             If you need to talk to him, you can send him a

25   note; but not two at the same time.

1          Yes?

2               MR. COMMERSON:  It says "clients, customers,

3     employees."

4               The clients cause is illegal.  The customers

5     clause is illegal.

6               THE COURT:  Let me stop you for a minute.

7               The clients clause is illegal just based on

8     interfering with relationships?

9               MR. COMMERSON:  It's a noncompete.

10               THE COURT:  This is not noncompete language.

11               MR. COMMERSON:  That is a noncompete under

12     California law.

13               THE COURT:  Interfering with relationships would

14     be a noncompete?

15               MR. COMMERSON:  Yes.  That is a noncompete, and

16     you can't have that clause in California.

17               THE COURT:  Well, I'll take a look at that.

18               MR. COMMERSON:  So the agreement's invalid.

19     Bartley sues, he's got a good lawsuit, and he sued the only

20     place he could sue.

21               Now, first of all, there's a fundamental premise

22     here that they're based in New Jersey.  We don't think they

23     are.

24               THE COURT:  Well, that's something you can learn

25     in discovery.

1    MR. COMMERSON: November 2015, in the letter they

2  sent to Lucy Roberts, they said their corporate offices are

3  located in Irvine, California. Their web site says they're

4  located in Irvine. Everybody thinks their headquarters is

5  in California. They just say their headquarters is in

6  New Jersey.

7    THE COURT: But their principal place of business

8  and all their employees they've certified in the verified

9  complaint are all in New Jersey.

10    MR. COMMERSON: Okay. If that's what they've said

11  to the Court, great. Their principal place of business and

12  all their employees are in New Jersey. Great. Let's have

13  them hang themselves on that, because that's not true.

14    Almost none of their employees are in New Jersey.

15  They're mostly in Ohio and California.

16    THE COURT: Do me a favor: Please keep your voice

17  down, and don't talk over me.

18    And I'm going to let Plaintiff respond to that

19  point about the location of Display Works.

20    MR. GORDON: Certainly.

21    The CEO is here. The second in command is here.

22  There are 31 employees here. The web site says that Display

23  Works is based here.

24    There is -- what they're referring to is a video

25  that is on the web site that was put up five years ago and

1     is outdated, and frankly, I think is not there any longer

2     because it was -- it should have been taken down some time

3     ago.

4              They're desperate.  If they think that this is not

5     a New Jersey company, that is desperation.

6              A couple of quick points.

7              First of all, this isn't strictly relevant, but

8     there's something really awfully offensive about something.

9     As you noted, Mr. Bartley was in California, signing up

10    employees, the noncompetes and nonsolicited, kids, junior

11    people, and here he comes, asking this Court to relieve him

12    from his nonsolicit?

13             I think, if anything, on the balance of the

14    equities, wow, that's a loss for them.  There's something --

15             MR. COMMERSON:  Your Honor --

16             THE COURT:  Let him finish.

17             MR. GORDON:  You know, I didn't interrupt.

18             A couple other points that my adversary was

19    making.

20             He said, well, you know, you really can't -- it's

21    really -- you can't enforce these provisions because, look,

22    he's an employee in California and you're in New Jersey and

23    you can't let that happen.

24             Well, I mean, we've cited to you a number of cases

25    where courts across the country have enforced restrictive

1     covenants involving people who were employed in California.

2     I don't know that you need me to point them out to you.

3     They're in our reply brief.

4           I would also note, I mean, the hypothetical that

5     was set up, it was a straw man as well, I mean, if there's

6     somebody that comes from -- a Texas company employs someone

7     in New Jersey and they don't want to comply with New Jersey

8     laws?  Well, here's the problem with that analysis.  It's

9     twofold.  First, there's a choice of law provision here that

10    is not in his hypothetical, and, second, in our situation,

11    there's no conflict between the Maryland law and New Jersey

12    public policy.  They're in line, as you've noted.

13          In his hypothetical, there is potentially a policy

14    -- there's a conflict -- well, first of all, there's not

15    even a choice of law provision, but even if you assume

16    arguendo that there is some choice of law provision that

17    says Texas law, his hypothetical assumes a conflict that is

18    not present here.

19          So there's so much that is wrong with that, but

20    suffice it to say we absolutely stand by that this is a

21    New Jersey company.  That's going to be very easy to prove.

22          MR. COMMERSON:  If I can finish my point.

23          THE COURT:  Sure.

24          MR. COMMERSON:  What he just said is they've got

25    two officers and 30-some employees.  How many do they have

1   in California and Ohio?  Recently, up till recently, their

2   recent defection, they said they had a hundred employees in

3   California.  I don't know how many they have in Ohio.  But

4   overwhelmingly, based on what they just said, the Court was

5   operating under the assumption that they are a New Jersey

6   company with all of their employees in New Jersey, the Court

7   said.

8           That's not true.  Even from what counsel just

9   said, almost all their employees aren't in New Jersey.

10          MR. GORDON:  There are employees across the

11  country.  What we said, and this is throughout our papers,

12  the company has I think five or six offices throughout the

13  country.  The headquarters is in New Jersey.  That is where

14  the people who own the company are based.  That is where the

15  senior officers are based.  That is where all of the --

16          THE COURT:  How many employees are in New Jersey?

17          MR. GORDON:  Thirty-one.

18          THE COURT:  And how many employees are there

19  elsewhere?  Are there more than 31 anywhere else, or that

20  many?

21          MR. GORDON:  You know, I can't tell you how many

22  is in each location, but I can tell you that there are

23  multiple other offices.  I know there 's Ohio, there's the

24  Houston, Texas office, and there are -- I think there are a

25  few others.  I can -- if I can dig it -- dig them out, I

1     will.

2               MR. COMMERSON:  The point, Your Honor, is, the

3     overwhelming majority of their employees are not in

4     New Jersey.  So --

5               THE COURT:  They didn't say that.  You just made

6     that up.  He just said there's 31 --

7               MR. COMMERSON:  Right.

8               THE COURT:  -- and the principals, the CEO, I

9     think he said, and, he said, we have some other employees in

10    Houston and in Ohio.

11              MR. COMMERSON:  Yes?

12              THE COURT:  So I don't know how many.  I mean, you

13    just made that up.  We have --

14              MR. COMMERSON:  Well, it's --

15              THE COURT:  Let me finish.

16              Don't make up facts.  We'll find it out.  But we

17    don't know now how many are in California, how many are in

18    Texas, and how many are in Ohio and how many are in

19    New Jersey.

20              MR. COMMERSON:  It's in Mike Bartley's affidavit.

21    Until the Pinnacle resignations, there were 100 employees in

22    California, and 30 resigned.  So we do know that.  That's in

23    the record.

24              THE COURT:  Okay.

25              MR. COMMERSON:  So even then, just California, you

1      have more California employees than New Jersey.  That's not

2      reckoning -- our understanding is that the second-biggest

3      office after California is Cincinnati, Ohio.

4                THE COURT:  Is that true?

5                MS. COYOCA:  Your Honor, I can't give you the

6      breakdown of each of the individual offices, but what he is

7      speaking to in terms of the Pinnacle employees that have

8      departed, that was over a year ago, before Mr. Bartley ever

9      left.  He's talking about the number of employees that would

10     have been in California but for the employees that left and

11     went over to Pinnacle.  That's not what we're talking about

12     here.  What we're talking about here --

13                THE COURT:  Is now, when you filed the complaint.

14                MS. COYOCA:  -- is right now, yes, exactly, how

15     many employees there are total in the company.

16                And you have in the declaration from Mr. Lacamera

17     that there are --

18                THE COURT:  The first one, or the supplemental

19     one?

20                MS. COYOCA:  The supplemental declaration, Your

21     Honor.

22                THE COURT:  Okay.

23                MS. COYOCA:  And you have there a statement that

24     Display Works has approximately 110 employees, that's in

25     paragraph two, and that 31 of them are located in

 1    New Jersey.  They also have offices in -- or locations in

 2    Cincinnati, Ohio, also in Houston, and in Irvine.

 3             Now, if you take out those 31 employees of the

 4    110, are they a hundred percent located in Irvine,

 5    California?  That's what counsel seems to be suggesting.

 6    That is not the case.  That is absolutely not the case.  I

 7    can't give you the precise breakdowns, but we certainly can

 8    provide it with respect to how many employees are in each of

 9    the other offices.

10             But the point of the matter here is that for

11    purposes of the jurisdictional analysis, where you have

12    contradictory facts that are being submitted, lobbed in by

13    affidavits, under the LaRose v. Sponco decision, the Court

14    is supposed to apply the -- LaRose v. Sponco Manufacturing,

15    I apologize -- "Factual discrepancies should be resolved in

16    favor of the party bearing the burden of establishing

17    jurisdiction."

18             What we have here is that they're simply -- there

19    are facts being lobbed in, saying, Oh, this is what

20    Mr. Bartley says, this is what Mr. Bartley says.

21             Well, that's not what the CEO and the executive

22    vice president of the corporation said.  They've said

23    something different.

24             So you've got these contradictory allegations.

25             THE COURT:  Which can always be resolved by taking

1    depositions, and do that, or have certifications, additional

2    certifications prepared, because I think Display Works is in

3    the best position to talk about whether it's truly their

4    principal place of business.

5            MS. COYOCA:   Correct.   We are happy to do so,

6    Your Honor.

7            THE COURT:   They said 110 -- this is from the

8    supplemental declaration of Lacamera -- 110 employees, 31 in

9    New Jersey, including its senior management team.   That's

10   what they say.

11           MR. COMMERSON:   All right.   I have no basis to

12   dispute that.   That's still a majority not in New Jersey.

13           THE COURT:   But if your senior management team and

14   the majority of your employees are there, is there a law

15   that says I can't -- this is improper venue, or -- we can

16   talk about venue in a second, but this is -- they're lying,

17   that it's not their principal place of business?

18           MR. COMMERSON:   Well, first of all, I haven't

19   gotten to my point yet, but they have said publicly twice,

20   and once in November 2015, that their corporate offices are

21   in Irvine, once on their web site, which maybe they recently

22   took down, and once in the letter from their HR director,

23   Lucy Roberts.   So they've represented publicly that their

24   corporate offices are in Irvine.   Mr. Bartley thought that

25   their corporate headquarters were in Irvine.   They do have

1      some people in New Jersey.

2                    THE COURT:  And now they've sworn under oath that

3      that's not the case.  They have a sworn statement saying our

4      principal place of business is in New Jersey.  No one's

5      disputing that the management team is there, and no one's

6      disputing that at least 31 employees are there.  All you

7      keep coming back to is a web site and that there's a letter

8      that says -- references Irvine.

9                    MR. COMMERSON:  One other point before I --

10                   THE COURT:  Maybe take a deposition.

11                   MR. COMMERSON:  I'm still not on my point, but

12     there's one thing that counsel said that I'll sidetrack to.

13                   If the Court has the Lacamera affidavit in front

14     of it, I direct the Court's attention to paragraph eight of

15     the Lacamera affidavit.

16                   THE COURT:  Which one; the first one, or the

17     second one?

18                   MR. COMMERSON:  The first one.

19                   THE COURT:  Okay.

20                   MR. COMMERSON:  Display Works claims that

21     Mr. Bartley was a member -- originally claimed he

22     was a member of the board.  Then in their supplemental

23     pleadings, they say we have a de facto board, because they

24     don't have a board.

25                   But the thing is, fiduciary duty.  They're an LLC.

1    Under New Jersey law, the members and the managers of the

2    LLC are fiduciaries.  He is neither, but they try and vest

3    him with -- they first told the Court he's on the board, a

4    high-ranking executive, and he's a fiduciary.  He's not.

5    Read paragraph eight --

6            THE COURT:  Okay.  So what's the point?

7            MR. COMMERSON:  The Court just said as part of its

8    analysis of jurisdiction he's a high-ranking executive.

9            THE COURT:  Well, he may not be part of this

10   de facto or real board, but I don't think you would even

11   dispute that he's --

12           What's his title?

13           MS. COYOCA:  President of the west coast division.

14           THE COURT:  President of the west coast division.

15   He's high-ranking.  I mean, he's not a minor -- he's not the

16   clerk.

17           MR. COMMERSON:  Read paragraph eight of the

18   Lacamera affidavit.

19           THE COURT:  I read paragraph eight.  Don't tell me

20   what to do, counsel.  I read it.  I get your point.  Okay?

21   He wasn't on the board.  I get it.

22           MR. COMMERSON:  He had no decisionmaking

23   authority, says Mr. Lacamera, in paragraph eight.  In

24   paragraph eight, Mr. Lacamera says, and I quote:  "Bartley

25   required approval from Mike Fernandez or myself in

1       New Jersey on all hiring and other key decisions, and could

2       not make such decisions independent of authorization from

3       those individuals."

4              That's not a fiduciary, here or anywhere else.  If

5       paragraph eight's true, he's not a fiduciary.  He has a

6       title and no authority.

7              THE COURT:  And your point is?

8              MR. COMMERSON:  To the extent that the Court

9       thinks that Mr. Bartley's high level of authority is

10      important --

11             THE COURT:  To what?

12             MR. COMMERSON:  To its jurisdictional decision.  I

13      was responding to something the Court said.

14             THE COURT:  Jurisdictional decision?  I said to

15      you in terms of jurisdiction I was satisfied there is

16      personal jurisdiction.  It wasn't based on him being a

17      high-ranking official, and I'm going to put that on the

18      record after I take a break.  Okay?  There's lots of

19      contacts with the New Jersey office, thousands of e-mails,

20      daily contact with Fernandez, Lacamera, other supervising

21      people in New Jersey.  I can go through the verified

22      complaint and the Lacamera affidavit, which I will do.

23             I am not going to find, nor would the law permit

24      me to find, specific jurisdiction based on his rank within

25      the company.  He's the president or the vice president of

 1      west coast operations.  I agree with you, I have no reason

 2      to dispute that he may or may -- that he wasn't on the

 3      board, and they said de facto board.  The specific

 4      jurisdiction against him will not rest on whether he was on

 5      the board or that he was just someone else who was in charge

 6      of the west coast office.

 7              MR. COMMERSON:  All right.  So I'll get to my

 8      point, which I -- so Mr. Bartley filed a lawsuit, which is

 9      -- I haven't heard anyone question the legitimacy of the

10      lawsuit.  Again, it would be exactly the same as -- and by

11      the way, counsel said that my --

12              THE COURT:  That's very different.

13              MR. COMMERSON:  -- my Texas analysis is wrong

14      because it wasn't a choice of law clause.

15              Let's say there is a choice of law clause.  A

16      Texas company has an agreement with a New Jersey employee,

17      and the New Jersey employee has a choice of law clause, and

18      the Texas employer violates New Jersey employment law, it

19      says I'm not going to pay his sick leave or discriminates

20      against him based on some basis that is illegal in

21      New Jersey, but not in Texas.  They're going to file a claim

22      with the New Jersey Department of Human Rights, the

23      E.E.O.C..  They're going to have a valid claim in New Jersey

24      whether they would in Texas or not, and the choice of law

25      clause isn't going to get the Texas employer out of

1       violating New Jersey law.

2                 The same thing here.  Mr. Bartley has a good

3       lawsuit which he first filed in California.  When they

4       removed it, under the first-filed rule, which does not

5       require identity of parties or identities of causes of

6       action, the first-filed rule reckons back to the date of

7       filing.

8                 THE COURT:  Okay.  I understand that.  Anything

9       else you want to add to what I propose, because I get that.

10      I know your arguments.  I read all your briefs.  I'm going

11      to take a break, and I'll think about how I'm going to

12      handle this, but anything else that you want to add before I

13      make a ruling?

14                MR. COMMERSON:  I would like -- I haven't gotten

15      to the jurisdiction issue.

16                I would note that this Court's McCourt decision --

17                THE COURT:  I'm sorry?

18                MR. COMMERSON:  This Court's McCourt decision,

19      which we cited --

20                THE COURT:  And I said that's a legal question in

21      terms of whether there's jurisdiction by consent.

22                MR. COMMERSON:  Right.

23                THE COURT:  I get it.  I know that.  I wrote the

24      opinion.  I'm familiar with it, and I'm thinking it through,

25      but that's a legal question.  If there's anything that

1    wasn't in your briefs that you'd like to emphasize, say it

2    now.

3                MR. COMMERSON:  As to Mr. Bartley's personal

4    jurisdiction, the e-mails, the contacts, et cetera, the

5    reasons that we've cited in our brief, none of that was him

6    purposely availing himself of New Jersey.  As we've cited in

7    our brief, that's because they were located in New Jersey,

8    and the cases that we've cited, including U.S. Supreme Court

9    cases, say you cannot have contact with the Plaintiff itself

10   be your only source of contact with the location of

11   jurisdiction.  It has to be something that he did in his own

12   availing self.  They could have chosen to locate their

13   business in Maryland, New Jersey, Texas, Alaska, and

14   Mr. Bartley would then have phone contact with the home

15   office because that's where they're at, and we've said in

16   our brief those phone and e-mail contacts don't create

17   jurisdiction, and if they get -- if the Court --

18                THE COURT:  It's more than e-mail.  It's more than

19   e-mail.  I agree with you:  If he did nothing but send

20   e-mails to New Jersey, it would be different.  He was

21   supervising employees in New Jersey.  He had thousands of

22   e-mails.  He had daily phone contact.  He dealt with trade

23   shows in New Jersey.  He was supervising business in

24   New Jersey.  It wasn't just he sent a couple e-mails to

25   New Jersey.

1          MR. COMMERSON:  For general jurisdiction, they

2     would only have general jurisdiction over Mr. Bartley where

3     he lives.  So for specific jurisdiction, those types of

4     contacts aren't -- don't count.

5          THE COURT:  But the whole basis for jurisdiction,

6     specific jurisdiction is the employment dispute, and the

7     execution of his employment agreement, everything that is

8     part and parcel of his contract is at dispute here.  The

9     execution of the contract occurred in New Jersey.

10          MR. COMMERSON:  No, it did not.  It's not even

11     alleged to have occurred in New Jersey.  It occurred in

12     California.

13          THE COURT:  Well, no, I'm saying execution meaning

14     carrying out, not signing.

15          MR. COMMERSON:  And again, that --

16          THE COURT:  Well, that's --

17          MR. COMMERSON:  If the Court believes -- as

18     Mr. Bartley's averred, virtually all of his work was on the

19     ground in California.  If the Court believes that a majority

20     or even more than a de minimis amount of Mr. Bartley's work

21     was in New Jersey, then there's a serious factual

22     misrepresentation to the Court.

23          THE COURT:  No, here's what it's based on:  It's

24     based on performance of the contract in New Jersey.  He's

25     the west coast director.  It's laid out in the complaint.

1    I'll come back and I'll put it on the record.  It's

2    supervising employees in New Jersey through phone, through

3    conference calls, effectuating trade shows in New Jersey,

4    supervising employees who are effectuating that.  It is

5    constant contact with the senior management team, employees,

6    on a daily basis.

7             So that is the performance.  Yes, I don't dispute

8    that he did some of his job in California.  I also have

9    before me that in carrying out his job responsibilities with

10   Display Works, he had regular contacts through his

11   employment with the folks in New Jersey, and that, I think,

12   is enough to exercise specific jurisdiction over him in

13   New Jersey.

14            But I'm going to take a break and take a look at

15   this.

16            Anything else that anyone wants to add?

17            MS. COYOCA:  Your Honor, I presume that after the

18   break, we'll be addressing the procedure to --

19            THE COURT:  Yes.  Okay?

20            MS. COYOCA:  Thank you.

21            THE COURT:  Thank you.

22            THE COURT CLERK:  All rise.

23        (Recess taken)

24            THE COURT CLERK:  All rise.

25            THE COURT:  Okay, guys.  Have a seat.

CHARLES P. McGUIRE, C.C.R.

1          All right.  So as I started out the argument

2     earlier this afternoon, I am inclined to extend the

3     restraints under Rule 65 through March 9th, give the parties

4     an opportunity to brief -- to take -- I have Magistrate

5     Judge Hammer, who is right next to me, to my right, and

6     he'll oversee any discovery that you need on the issue of

7     personal jurisdiction as it relates to Derse.

8          And I think I gave direction where I think the

9     discovery needs to go.  It should be limited discovery

10    really on the issue of any contacts or any contacts directed

11    towards New Jersey with respect to employees, customers, or

12    defamatory statements that were undertaken by anyone at

13    Derse or by an agent of Derse, someone who worked at Derse

14    other than I guess Bartley as well.

15         So I want to know Derse expressly aimed his

16    conduct at New Jersey such that the forum can be the focal

17    point of the tortious activity, which means soliciting

18    clients, making defamatory statements in New Jersey, or

19    soliciting employees of Display Works in New Jersey.  So

20    that should be the limited focus.

21         I know you don't have a chance to fully -- there

22    may be some other slightly related issues, but it's really

23    looking at whether there's specific jurisdiction over Derse.

24         And I want limited discovery.  I don't know if you

25    need to take depositions, I don't know if you can do it by

54

1    affidavits, if you can have an investigator talk to the

2    clients or the customers, if you need to take a particular

3    employee's deposition in California, but we're under a time

4    constraint under Rule 65.

5            So I'm going to resume the hearing here, unless I

6    take it on the papers, which would be Tuesday, March 8th,

7    and I want any papers by Monday at 10 a.m. electronically

8    filed so I have Monday to read them in preparation for

9    Tuesday's hearing.  It will be 2 p.m. on Tuesday.

10           MR. COMMERSON:  Papers by Monday, March 7, Your

11   Honor?

12           THE COURT:  At 10 a.m.

13           MS. COYOCA:  Your Honor, just one quick question.

14   With respect to documents, can we seek the production of

15   documents as well?

16           THE COURT:  Yes.

17           MS. COYOCA:  Thank you.

18           THE COURT:  And you can actually talk to

19   Judge Hammer briefly or he can convene a conference call

20   Monday so you will have a chance to speak, because I know

21   time is of the essence.

22           So I want it limited.  I don't want this to be an

23   invitation at this juncture to take merits discovery or

24   anything beyond the narrow issue of specific jurisdiction

25   over Derse.  Okay?

1              Anybody else?

2              MS. COYOCA:  Understood, Your Honor.

3              MR. COMMERSON:  Yes, Your Honor.

4              THE COURT:  Yes.

5              MR. COMMERSON:  Two questions.  One, there's an

6    issue of specific jurisdiction for Bartley where we

7    respectfully and strongly disagree with the facts.

8              THE COURT:  I'll make a finding on the record

9    today.

10             Anything else?

11             MR. COMMERSON:  May we take discovery on the

12   specific jurisdiction issues, the facts that the Court's

13   relying on with respect to specific jurisdiction issues for

14   Mike Bartley?

15             The Court has some fact ideas regarding how much

16   time Mr. Bartley spent communicating with Display Works in

17   New Jersey.

18             THE COURT:  You can do that by an affidavit of

19   him.

20             MR. COMMERSON:  We have submitted one yesterday

21   which disputes their facts, which apparently didn't get to

22   the Court.

23             THE COURT:  I will read it in preparation for the

24   hearing.  But let me -- the facts that give rise to the

25   specific jurisdiction of Mr. Bartley are really set forth

Exhibit E
Page 66
CHARLES P. McGUIRE, C.C.R.

1    not only in the verified complaint, which is a sworn

2    affidavit -- and let me just go through it for the record so

3    that we have a full record on the jurisdictional issue.

4            I'm going to put consent jurisdiction on hold

5    because I want to look at those cases a little more

6    carefully, which is really a legal issue.

7            I want to talk a little about specific

8    jurisdiction, because I made a finding, and I don't think

9    it's seriously contested, that there is no general

10   jurisdiction over either Bartley or Derse.

11           Specific jurisdiction arises when a nonresident

12   has certain "minimum contacts" with the forum state such

13   that the maintenance of the suit does not offend traditional

14   notions of fair play and substantial justice.

15   International Shoe v. Washington, 326 U.S. 310, 316 (1945).

16   Three related questions are required:  The relationship must

17   arise out of contacts the defendant purposely directed at

18   the forum state, looking to the defendant's contacts with

19   the forum state; the litigation must arise out of or

20   directly relate to those contacts; and, three, whether the

21   exercise of jurisdiction is fair and just.  Waldor v. Fiore,

22   134 S. Ct. 115 (2014).

23           Let me talk a little bit about the Calder test.

24           In addition to the traditional specific

25   jurisdiction inquiry that I've just described, the Court

1     also considers principles under the Calder "effects test"

2     for intentional torts.  The Calder test requires a plaintiff

3     to demonstrate that, one, the defendant committed an

4     intentional tort; two, the plaintiff felt the brunt of the

5     harm in the forum such that the forum can be said to be the

6     focal point of the harm suffered as a result of the tort;

7     and, three, the defendant expressly aimed his tortious

8     conduct at the forum such that the forum can be said to be

9     the focal point of the tortious activity.  And that was

10    reaffirmed in Marten v. Godwin, 499 F.3d 290 (3rd Cir.

11    2007).

12         So let me talk a little bit about the facts that

13    give rise to specific jurisdiction over Mr. Bartley, and I'm

14    going to begin by referring to the verified complaint, page

15    8, reading from paragraph 21:

16         "Bartley worked out of Display Works' office in

17    Irvine, California but traveled throughout the country on

18    behalf of the company, and traveled to the east coast to

19    attend Board meetings and other critical business meetings

20    each year.  He regularly attended weekly Board meetings in

21    New Jersey by teleconference, participated in strategic

22    discussions concerning critical business affairs, and was

23    involved in all aspects of the decision making process for

24    Display Works.  Although Bartley worked out of the Irvine

25    office, he had constant and substantial interactions with,

1    and relied upon, the Display Works employees and officers in

2    the New Jersey office.  In addition to traveling to the east

3    coast, Bartley interacted with Display Works' New Jersey

4    headquarters as though he were physically located in the

5    office himself, sending numerous e-mails and having

6    telephone calls with New Jersey personnel each day.

7            "Paragraph 22:  Bartley reported directly to

8    Michael Fernandez, an owner and CEO of Display Works.  He

9    worked extensively with Nick Lacamera, an owner and

10   executive vice president.  Both Fernandez and Lacamera are

11   located in New Jersey.  Fernandez and Lacamera were in

12   daily, and oftentimes, hourly, contact with Bartley and

13   exchanged thousands of e-mails together.  Fernandez,

14   Lacamera and Bartley corroborated on all day to day

15   operational business issues ranging from customer specific

16   sales and pricing strategies to employee issues and

17   financial management of the operation as well as corporate

18   issues for all locations across the country.  Bartley also

19   worked with other senior personnel in the New Jersey office,

20   including the creative team and account executives, and

21   supervised an employee in the office as well.  Further,

22   Bartley also directed the work, products, and services

23   provided to clients and customers who conduct shows in

24   New Jersey."

25            And the supplemental certification of Mr. Lacamera

1      states as follows:

2              "Paragraph seven:  In the two years preceding

3      Bartley's resignation from Display Works on January 7, 2016,

4      Bartley was in near daily contact with either myself or Mike

5      Fernandez, Display Works' Chief Executive Officer.  He sent,

6      received, and was copied on approximately 5,000 e-mails with

7      Fernandez during this time frame, and either sent, was the

8      recipient, or was copied on approximately 4,000 e-mails with

9      me during this same time frame.  Bartley required buy-in

10     from either myself or Fernandez on all important decisions

11     including hiring and firing and major company expenditures.

12             "Bartley required approval from Fernandez and

13     myself in New Jersey on all hiring and other key

14     decisions..."

15             "Bartley communicated with Mike Fernandez and

16     myself relating to national Display Works business."

17             Paragraph 10:  "...Bartley collaborated on a

18     regular basis with other New Jersey based Display Works

19     personnel, including Display Works' Creative Director,

20     John Spetrino, Head of IT and Digital Technologies,

21     Ali Fathali, Thomas Saltalamacchia, Vice President of

22     Operations, and William Holmes, Trade Show Account

23     Executive.  Bartley also supervised an employee in the

24     New Jersey Office, Joseph DellaSalla, Director of Show

25     Service Sales and Operations."

1       So based on those facts set forth in the affidavit

2   and verified complaint, I am satisfied that there is

3   specific jurisdiction over Bartley.  Although he was located

4   in California, he reported directly to the New Jersey CEO

5   and management team, he was engaged in daily e-mail and

6   telephone contact with New Jersey headquarters on a regular,

7   systematic basis, he participated in strategy meetings and

8   management calls, teleconferences with New Jersey

9   individuals, and at least on one occasion was physically

10  present in New Jersey.

11      These activities are not fortuitous contact.

12  Bartley purposely and continuously conducted these

13  activities and targeted them at New Jersey.  Nor are they

14  the type of insignificant activities like those in

15  Dailight v. Allen where the out-of-state employee's contacts

16  with New Jersey were rare visits to the state and accessing

17  computer servers located here.  Dailight Corp. v. Allen,

18  Westlaw 5996287, (D.N.J. 2015).  Bartley's argument that he

19  was not physically present in New Jersey is also immaterial.

20  "Physical presence in the forum is not a prerequisite to

21  jurisdiction... [P]hysical entry into the State - either by

22  the defendant in person or through an agent, goods, mail or

23  some other means is a relevant contact.  Walden,

24  134 S.Ct. 1122.

25      The Court also notes that the litigation arises

1    directly out of or leads to those contacts.  Plaintiff

2    alleges that Bartley used these contacts and his employment

3    relations with Display Works to solicit and steal clients,

4    employees, and engage in defamatory activity directed to

5    Plaintiff's business.

6            Third, given Bartley's continuous contacts with

7    New Jersey, there is no doubt that he should have

8    anticipated that he could be sued there.  The exercise of

9    jurisdiction in this Court's opinion is therefore fair and

10   just.

11           So that's my basis for finding of specific

12   jurisdiction over Bartley.

13           I don't want this to turn into on the short time

14   frame discovery on Lacamera and Fernandez.

15           I will certainly to the extent you can get a

16   transcript of today's proceeding, to the extent that you

17   want to challenge the sworn statements of either

18   Mr. Lacamera or -- I think the verified complaint was signed

19   by Lacamera -- I'm not satisfied, you can raise it with

20   Judge Hammer whether you need to take Lacamera's deposition.

21           You can bring Mr. Bartley if you want to the

22   hearing on Tuesday the 7th, and you can have live testimony,

23   but I'm not sure you need it.  All the sworn statements that

24   I'm basing it on are from Lacamera.  If you want to

25   challenge those, I'll take a look at the affidavits that you

 1       filed recently.  You can do it as a supplemental on Bartley

 2       as well.

 3              MR. COMMERSON:  So I think I understand what the

 4       Court said, and again, I understand what Mr. Lacamera said.

 5       We did submit a supplemental affidavit for Mr. Bartley, and

 6       we do fundamentally disagree with some facts.  So there's

 7       some facts that the Court read, some of which we'd agree

 8       with, many of which are not, we think, factually accurate,

 9       and we will take up, if I understand the Court correctly, a

10       deposition of Mr. Lacamera otherwise challenging --

11              THE COURT:  No, I didn't say that.  That's not

12       what I said at all.

13              Let's be clear.  You can raise it with -- I think

14       it would be -- I want to take a look at that affidavit.  I

15       don't think you need to take Lacamera's deposition for this

16       narrow purpose.  You can do a supplemental affidavit now

17       that you know what my findings are based on.  It's based on

18       his sworn testimony.  You can give me another, more

19       responsive certification from your client.  You can bring

20       your client to the hearing.  But I don't want this to turn

21       into a minitrial in such a short time frame, unless you want

22       to consent to have the restraints go further so you can take

23       the deposition.  But I'm on a tight time frame under the

24       rules, and that means within -- I want to be satisfied about

25       whether or not there's general or specific jurisdiction

1    against Derse.  I'm not sure taking Lacamera's deposition on

2    what I just read into the record would be productive or

3    helpful to the Court.

4             So the answer is no.  The answer is no.  Let's

5    make it easy.  You can submit a supplemental -- unless

6    there's some extraordinary, limited reason that you need to

7    take Lacamera's deposition, you can brief it to

8    Judge Hammer.  But the more I reason it through, if you

9    want to challenge what he has to say, you can do it through

10   an affidavit of Mr. Bartley.

11            This is not a real complicated analysis.

12            MR. COMMERSON:  Well, I understand what the

13   Court's saying, and --

14            THE COURT:  So in other words, if I'm going to get

15   an affidavit to say he didn't send 5,000 e-mails, he only

16   sent 4,500, it's not going to change my view.  The cases

17   that I cited -- I want you to get a copy of the

18   transcript -- talk about continuous directed contacts in

19   New Jersey such that it wouldn't be fair to exercise

20   specific jurisdiction over him.  The facts that I relied on

21   were the nature of his regular contacts.  If you're saying

22   he never called New Jersey, ever, or he called once a month,

23   he never talked to any of these guys, he never sent e-mails,

24   that would be important to me, because that would suggest

25   that the sworn statement that I just read into the record is

1     false.   If it's a matter of degree -- well, he didn't talk

2     every day, but he did talk every week -- that's probably not

3     going to persuade me.

4              So I don't know what you want to take Mr. Lacamera

5     for.   That they're totally false statements, there's no

6     contact over the years with the folks at Display Works and

7     your client?

8              MR. COMMERSON:  We submit that the contacts are

9     grossly exaggerated.   We would not say there's no contacts.

10             And again, we briefed this, but I'll read from the

11    3rd Circuit -- or the Eastern District of Pennsylvania's

12    case, Baron & Company v. Bank of New Jersey, which deals

13    with this type of ongoing contact, and I said before, even

14    if -- first of all, we have an affidavit, the Court can look

15    at it, and I understand that we can't test -- the part I

16    have a problem with is, if Lacamera said it doesn't make it

17    so.

18             THE COURT:  Okay.  I get that.  So tell me if it's

19    false:  He never called New Jersey ever?

20             MR. COMMERSON:  No, not never, but not nearly --

21    to the extent the Court's swayed by big volume, big volume's

22    not accurate.   Second -- and I'll read from the Baron

23    decision -- the type of contacts the Court's talking about

24    don't create jurisdiction, and here's why.

25             THE COURT:  Well, that's a legal issue that you

1      can brief to me.  It's not a factual issue.  If you're

2      saying -- if you want to make the argument, you can send me

3      a brief by next Wednesday and say, Judge, you got the law

4      wrong.

5                   Even if I accept everything that you said, it's

6      not enough.

7                   Send me another brief.  I don't want the argument

8      now, counsel.  I want a brief, and I'll deal with it.

9                   But if that's the case, you don't need any

10     discovery.  That's purely a legal argument.  And if the

11     issue is, it's not that Lacamera is a liar, it's just that

12     he exaggerated the context, well, you tell me what the

13     context is through an affidavit of Mr. Bartley and I'll take

14     that under advisement.  Okay?  That's how I'd like to

15     proceed.  Okay?

16                  MR. COMMERSON:  Thank you.

17                  THE COURT:  Anything further?

18                  MS. COYOCA:  One question, Your Honor.

19                  With respect to the motion to dismiss, to the

20     extent it's directed to Bartley, are you ruling on that

21     motion today?

22                  THE COURT:  No, I'm not ruling on anything, and

23     we're going to continue everything until Tuesday.  Okay?

24                  MS. COYOCA:  Until May 9th.

25                  THE COURT:  May 9th.

1          MS. COYOCA:  Excuse me:  March 9th.

2          THE COURT:  March 9th.

3          Okay.  Thank you.

4          MR. COMMERSON:  I have one other thing.

5          THE COURT:  Yes.

6          MR. COMMERSON:  If I may, there's another motion

7      that we filed which is based on the first-filed rule.

8          THE COURT:  And that will be taken in the normal

9      course under the Federal Rules of Civil Procedure.

10          Thank you.

11          MR. COMMERSON:  Thank you.

12          THE COURT CLERK:  All rise.

13          (Matter concluded)

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT F

**Nutt, Sandra**

| | |
|---|---|
| **From:** | njdefiling@njd.uscourts.gov |
| **Sent:** | Thursday, March 03, 2016 12:42 PM |
| **To:** | njdefiling@njd.uscourts.gov |
| **Subject:** | Activity in Case 2:16-cv-00583-MCA-MAH DISPLAY WORKS, LLC v. BARTLEY et al Order |

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**

**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply**

## U.S. District Court

### District of New Jersey [LIVE]

**Notice of Electronic Filing**

The following transaction was entered on 3/3/2016 at 3:42 PM EST and filed on 3/3/2016

**Case Name:**    DISPLAY WORKS, LLC v. BARTLEY et al

**Case Number:**    2:16-cv-00583-MCA-MAH

**Filer:**

**Document Number:** 53(No document attached)

**Docket Text:**
**TEXT ORDER, The restraints set forth in the Court's Feb. 10, 2016 TRO are hereby extended through March 17, 2016. Any supplemental affidavits and briefs shall be filed by 10 a.m. on March 15, 2016 or sooner if practicable. Hearing to continue on March 17, 2016 at 11:00 a.m. So Ordered by Judge Madeline C. Arleo on 3/3/16. (aa, )**


**2:16-cv-00583-MCA-MAH Notice has been electronically mailed to:**

DAVID BRUCE GORDON    dbg@msk.com, grs@msk.com, txm@msk.com

SCOTT M. COOPER    scottcooper@dwt.com, avisjackson@dwt.com, emiliogonzalez@dwt.com, miriamcardona@dwt.com, scottcommerson@dwt.com

**2:16-cv-00583-MCA-MAH Notice will not be electronically mailed to::**

# EXHIBIT G

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| DISPLAY WORKS, LLC, | CIVIL ACTION NO. 2:16-CV-00583-MCA-MAH |
| Plaintiff, | |
| v. | |
| MICHAEL BARTLEY, an individual, and DERSE, INC., | [~~DISPLAY WORKS' PROPOSED~~] **ORDER RE JURISDICTIONAL DISCOVERY** |
| Defendants. | |

On February 26, 2016, this Court, the Honorable Madeleine Cox Arleo, United States District Court Judge for the District of New Jersey presiding, entered an order extending the Temporary Restraining Order ("TRO") first entered against Defendants on February 10, 2016, and further ordered that Display Works be permitted to take certain jurisdictional discovery pertaining to the Court's exercise of personal jurisdiction over Defendant Derse, Inc. ("Derse") (Dkt. No. 50).

Discovery disputes arose as to the written discovery sought by Plaintiff Display Works, LLC ("Display Works") in its First Request For Documents and Information, the deposition discovery including the topics identified in Display Works' 30(b)(6) deposition ~~request~~ notice of Derse, Inc.'s corporate representative and Display Works' request for depositions of Defendant Michael Bartley, as well as Alison Baker, Katherine Minicucci, Carol Bjorn, Dionne Castro, and Lucy Montoya Roberts. A teleconference hearing was conducted in this matter before

the Honorable Michael Hammer, United States District Court Magistrate Judge

presiding, on Friday, March 4, 2016.

Lucia E. Coyoca, Samantha Grant, and David Gordon, of Mitchell

Silberberg & Knupp LLP, participated in the teleconference on behalf of Display

Works.  Eric Rumbaugh of Michael Best & Friedrich, LLP, and Scott Cooper of

Davis Wright Tremaine LLP, participated on behalf of Defendants Michael Bartley

and Derse (together, "Defendants");

For the reasons set forth on The record on March 4, 2016, and

In furtherance of the Court's February 26, 2016 Order, for good cause

shown,

IT IS on this ~~6~~th 14th day of March, 2016, **ORDERED THAT:**

A.     ~~The following~~ Display Works ~~document requests are~~

~~acceptable:~~ may seek the production of documents from Derse as to the

following topics:

1.     All documents that evidence or relate to ~~applications~~

communications between and among Michael Bartley, Alison Baker, Dionne

Castro, Carol Bjorn, Katherine Minicucci, Lucy Montoya Roberts, Adam

Beckett, Terry Logan and Sheri Thomka, and the three Derse employees

identified on page 2 of Defendants' Memorandum of Law in Support of

Their Motion to Dismiss the Verified Complaint Pursuant to Rule 12(b)(2),

ECF No. 13-1, concerning the following:

a.     Display Works;

offices of Derse, Inc.'s counsel.  The deposition must be aimed at the three

specific tasks regarding specific jurisdiction:, on the following topics:

1.    Communications that any employee, independent contractor,

agent, or representative of Derse has had with any company that

is headquartered, has its principal place of business, or which

has a brick and mortar facility, in New Jersey, including but not

limited to any company identified in Attachment A to Display

Works' request for production of documents, regarding Display

Works;

1.    The extent to which the Derse, Inc. allegedly reached into New
Jersey to solicit Plaintiff's New Jersey customers in New
Jersey.

2.    The extent to which Derse, Inc. allegedly reached into New
Jersey to solicit Display Works' New Jersey employees in New
Jersey.

3.    The extent to which Derse, Inc. allegedly defamed Display
Works in New Jersey or directed allegedly defamatory
comments to New Jersey (e.g., email communication to New
Jersey, etc.).

2.    Communications that any employee, independent contractor,

agent, or representative of Derse has had with any Display

Works' customer or client that is headquartered, has its

principal place of business, or which has a brick and mortar

facility, in New Jersey, including but not limited to any

company identified in Attachment A to Display Works' request

for ~~production of documents,~~ regarding Display Works'

customers or clients moving or potentially moving their work to

Derse.

3. Communications that any employee, independent contractor,

agent, or representative of Derse has had with any employee of

Display Works who works at Display Works' New Jersey

office.

C. Display Works' requests to take the depositions of Michael

Bartley, Alison Baker, Katherine Minicucci, Carol Bjorn, Lucy Montoya-

Roberts, and Dionne Castro, are denied, without prejudice to Display

Works' right to depose these individuals ~~subsequently in the litigation~~ *during merits discovery*.

D. ~~I.D.~~Display Works may serve interrogatories directed to ~~Michael Bartley, Alison Baker, Katherine Minicucci, Carol Bjorn, Lucy Montoya Roberts, and Dionne Castro~~ and aimed at the three specific ~~tasks regarding specific jurisdiction: The extent to which the Derse, Inc. allegedly reached into New Jersey to solicit Plaintiff's New Jersey customers in New Jersey.~~ :

*DERSE OR*
*MICHAEL BARTLEY*
*ALISON BAKER*
*KATHERINE Minicucci*
*CAROL BJORN*
*Lucy MONTOYA ROBERTS*
*DIONNE CASTRO*
*REGARDING:*

1. Derse's solicitation of any Display Works' customer or client that is

headquarters, has its principal place of business, or which has a brick

and mortar facility, in New Jersey, ~~including but not limited to any~~

~~company identified in Attachment A to Display Works' request for~~

~~production of documents;~~

2. ~~The extent to which Derse, Inc. allegedly reached into New Jersey to solicit Display Works' New Jersey employees in New Jersey.~~

3. ~~The extent to which Derse, Inc. allegedly defamed Display Works in New Jersey or directed allegedly defamatory comments to New Jersey (e.g., email communication to New Jersey, etc.).~~

1. ~~~~

<u>2.</u>     Derse's solicitation of any Display Works' employee who works in the New Jersey office of Display Works; and,

<u>3.</u>     Any disparaging or defamatory comments made by a Derse employee, independent contractor, agent, or representative to any company that is headquartered, has its principal place of business, or which has a brick and mortar facility, in New Jersey, including but not limited to any company identified in Attachment A to Display Works' request for production of documents.

**IT IS SO ORDERED.**

_____
HON. MICHAEL A. HAMMER
UNITED STATES MAGISTRATE JUDGE

025008 0128\18708792.1

THE PARTIES ARE REMINDED THAT THE DEADLINES ARTICULATED BY THE COURT DURING THE MARCH 4, 2016 CONFERENCE REMAIN IN FULL FORCE AND EFFECT.

# EXHIBIT H

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| DISPLAY WORKS, LLC, <br><br>        Plaintiff, <br><br>   v. <br><br> MICHAEL BARTLEY, an individual, and DERSE, INC., <br><br>       Defendants. | CIVIL ACTION NO. 2:16-CV-00583-MCA-MAH <br><br><br> **DECLARATION OF JOSEPH DELLA SALA** |

I, Joseph Della Sala, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1.     I am over the age of twenty-one and I am, and at all relevant times herein was an employee of Display Works ("Display Works"). I know the following facts based on my own personal knowledge, and if called upon to do so, could and would competently testify to the facts set forth herein.

2.     I was hired by Display Works in October 2014 as Director of Show Services – Sales and Operations. A true and correct copy of my offer letter is attached hereto as Exhibit A. At the time I was hired I resided in New Jersey and worked out of Display Works' New Jersey office in Parsippany. As set forth in Exhibit A, I reported directly to Michael Bartley.

3.     I did not report to any other Display Works employee while Mr. Bartley was employed at Display Works.

4.     I am primarily responsible for hiring third party companies that provide labor services to install and dismantle exhibits Display Works creates for clients for use at trade shows across the country and have had a hand in almost every build out of Display Works' exhibits from the time I began with the company. In direct coordination with Mr. Bartley, I ensured that the labor requirements for the installation and dismantling of each exhibit were provided at all trade shows attended by a Display Works' client.

5.      From the time I was hired in October 2014 through June 2015, when I moved from New Jersey to Florida, I managed between 75-100 exhibit installation and dismantle projects for Display Works, each of which were directly overseen by Mr. Bartley.

6.      In this connection, I emailed with Mr. Bartley daily, and sometimes multiple times a day, to coordinate between Mr. Bartley and account executives across the country to address specific client labor needs, preferences and cost considerations, obtain approval from Mr. Bartley to hire third party labor companies, work with Mr. Bartley to develop partnerships between labor companies and Display Works, and address any concerns raised by account executives pertaining to the labor companies chosen for a particular trade show.

7.      I also spoke with Mr. Bartley approximately two to three times per month on the phone in connection with his supervision of my responsibilities over Display Works installation and dismantling.

8.      As a general matter, I provided cost estimates and agreements from the labor companies with which Display Works contracted to the responsible account executive as well as to Mr. Bartley, and he was apprised of any necessary changes to the estimate or the terms of agreements.

9.      As my supervisor, Mr. Bartley also approved my vacation requests and expense reports, as well as client or account executive requests that I attend certain trade shows in person as opposed to overseeing and managing them from New Jersey.

I declare under the penalty of perjury under the laws of the United States of America

that the above statements are true and correct.

Dated this 14th day of March, 2016

Joseph Della Sala

# EXHIBIT I

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| DISPLAY WORKS, LLC, | CIVIL ACTION NO. 2:16-CV-00583-MCA-MAH |
| Plaintiff, | |
| v. | |
| MICHAEL BARTLEY, an individual, and DERSE, INC., | **DECLARATION OF ALI FATHALI** |
| Defendants. | |

I, Ali Fathali, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1.     I am over the age of twenty-one and I am, and at all relevant times herein was an employee of Display Works ("Display Works"). I know the following facts based on my own personal knowledge, and if called upon to do so, could and would competently testify to the facts set forth herein.

2.     I am the Director of Digital Media at Display Works. I am primarily responsible for planning, developing and implementing the digital media aspects of a client engagement and the digital enhancement tools that are integrated into client exhibits Display Works creates across the company, for all clients and exhibits. I supervise a team of six Display Works' employees, all of whom work in New Jersey and assist me with projects for the entire company's client roster. No Display Works employee based in California is responsible for any of the responsibilities my team and I perform. To the extent a Display Works employee in California, or anywhere else in the country, works on an exhibit with a digital media component, that employee necessarily relies on my team in New Jersey.

3.     I have worked for Display Works in New Jersey since 2014 when it merged with my former employer, Millennium Communications Group. I also live in New Jersey.

Exhibit I
Page 87

4.     I worked significantly and often with former Display Works' account executives Katherine Minicucci, Alison Baker and Carol Bjorn prior to their sudden departure to join Derse in January, 2016, and with their direct supervisor, Michael Bartley.  Specifically, I worked with Minicucci, Baker and Bjorn to develop unique interactive digital software that their respective clients requested for exhibits produced by Display Works.  I collaborated with these and other account executives under Mr. Bartley's supervision to define the scope, delivery deadlines and technical requirements and specifications of projects, which involved frequent communications and consultations.

5.     Because Mr. Bartley directly supervised Minicucci, Baker and Bjorn, I included him on many emails to those individual account executives in order to keep him apprised of the status of various outstanding projects as well as solicit his input and perspective from a client relations perspective.  I estimate that I communicated with Mr. Bartley in this manner at least two to three times per month, and sometimes more frequently when a specific project required.

6.     Mr. Bartley also participated in certain project kick off conference calls with myself, account executives Mr. Bartley supervised, and other Display Works employees from across the country, including New Jersey, developing comprehensive action plans for exhibits of clients for which Mr. Bartley was responsible.  These conference calls occurred every several months.

7.     I was also a part of the Display Works team responsible for the company's recent rebranding campaign, of which Mr. Bartley was directly involved prior to departure in January, 2016.

8.     Mr. Bartley's statements that he did not communicate routinely or consistently with Display Works' employees and representatives in New Jersey are not true.  He communicated regularly with many New Jersey based Display Works' employees, and I know

Exhibit I
Page 88
2

that he communicated on a daily basis, either by phone or email, with Mike Fernandez and

Nicholas Lacamera, because I was either a participant in those emails and calls or references

were made to them during my interactions with Mr. Fernandez and Mr. Lacamera.


     I declare under the penalty of perjury under the laws of the United States of America

that the above statements are true and correct.


Dated this 14th day of March, 2016

Ali Fathali

Exhibit I
Page 89
7473773.1

# EXHIBIT J

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| DISPLAY WORKS, LLC, <br><br>         Plaintiff, <br><br>    v. <br><br> MICHAEL BARTLEY, an individual, and DERSE, INC., <br><br>         Defendants. | CIVIL ACTION NO. 2:16-CV-00583-MCA-MAH <br><br><br> **DECLARATION OF THOMAS SALTALAMACCHIA** |

I, Thomas Saltalamacchia, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1.     I am over the age of twenty-one and I am, and at all relevant times herein was an employee of Display Works ("Display Works"). I know the following facts based on my own personal knowledge, and if called upon to do so, could and would competently testify to the facts set forth herein.

2.     I am the Vice President of Operations for Display Works. I began working for Display Works in 2007 as an independent contractor, and became an employee in 2011. I reside in New Jersey and work in the Display Works' New Jersey office in Parsippany. Although I work from New Jersey, I oversee operations for the entire company, including operations in the California office from which Michael Bartley worked.

3.     I am responsible for managing Display Works Accounts Receivable and Payable for the entire company. In this connection, I work to ensure that Display Works receives timely payment from its clients, negotiate the terms of agreements with third party vendors Display Works uses, and manage Display Works' relationship with its outside human resources and IT companies.

4.     As Chief Operating Officer and President of Display Works West Coast Division, Mr. Bartley was responsible for a significant number of Display Works' client accounts and

exhibit projects, and supervised dozens of employees. Because I managed the Display Works' finances related to client receipts, vendor payments, and other company wide costs, Mr. Bartley and I necessarily and frequently communicated on a variety of Display Works' business issues.

5.     In my capacity as VP of Operations, I communicated on a near daily basis with Mr. Bartley regarding accounts receivable from Display Works' clients under his management, vendors providing services and materials to the Display Works' facility in California, and costs for client exhibits. In addition to communicating directly with Mr. Bartley, I copied Mr. Bartley on most communications between myself and account executives and other Display Works' employees or contractors he managed in order to keep Mr. Bartley looped in on the status of accounts and vendor payments related to his employees, clients and exhibit projects under his management.

6.     In addition, I am the Display Works' liaison between the company and Display Works' outside human resources provider. If Mr. Bartley needed assistance on a human resources issue concerning employees under his supervision, he generally reached out to me for help in resolving the question with our human resources provider. Mr. Bartley also communicated with me when he needed approval for non-standard expenses related to our outside IT provider.

7.     Mr. Bartley and I also frequently communicated regarding deposit invoices for particular clients. A deposit invoice is the advance payment Display Works requires to begin work on a particular client exhibit. Oftentimes clients under Mr. Bartley's purview did not timely remit payment to Display Works and, as a result, I worked with Mr. Bartley and the responsible account executive to ensure the company received the deposit invoice as quickly as possible.

8.     Mr. Bartley also participated in conference calls with myself and account executives Mr. Bartley supervised concerning the account status of clients for which Mr. Bartley was responsible.  These conference calls occurred approximately two to three times per month.

9.     Mr. Bartley's statements that he did not communicate routinely or consistently with Display Works' employees and representatives in New Jersey are not true.  He and I communicated frequently concerning a wide variety of issues involving Display Works, and I am aware that he also communicated regularly with Mike Fernandez and Nick Lacamera, both Display Works executives based in New Jersey, because I was also privy to many of those communications or had discussions with Mr. Fernandez and/or Mr. Lacamera in which those communications were referenced.

I declare under the penalty of perjury under the laws of the United States of America that the above statements are true and correct.

Dated this 14th day of March, 2016

Thomas Saltalamacchia

7467417.2

# EXHIBIT K

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

DISPLAY WORKS, LLC,

        *Plaintiff*,

    v.

MICHAEL BARTLEY and DERSE, INC.

        *Defendants.*

Civil Action No. 16-583

**ORDER**

**THIS MATTER** having come before the Court by way of a preliminary injunction hearing held on March 17, 2016;

and for the reasons stated forth on the record, which will be expounded upon in a forthcoming opinion;

**IT IS**, on this 21st day of March, 2016,

**ORDERED** that the restraints on Defendant Derse, Inc. are dissolved due to lack of personal jurisdiction; and it is further

**ORDERED** that the restraints on Defendant Michael Bartley remain in effect.

*/s Madeline Cox Arleo*
**MADELINE COX ARLEO**
**UNITED STATES DISTRICT JUDGE**